Filed 12/16/14 unmodified opn. attached

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al., Plaintiffs and Appellants, | D063288 |
| v. | (Super. Ct. No. 37-2011-00101593-CU-TT-CTL) |
| SAN DIEGO ASSOCIATION OF GOVERNMENTS et al., Defendants and Appellants; THE PEOPLE, Intervenor and Appellant. | |
| CREED-21 et al., Plaintiffs and Appellants, | (Super. Ct. No. 37-2011-00101660-CU-TT-CTL) |
| v. | |
| SAN DIEGO ASSOCIATION OF GOVERNMENTS et al., Defendants and Appellants; THE PEOPLE, Intervenor and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING  NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the majority opinion filed on November 24, 2014, be modified as follows:

1. On page 18, line 2 of footnote 8, after the words "explained the Guideline," the words "which supplanted any earlier, informal technical advice from the Governor's Office of Planning and Research" are added." Footnote 8 now reads:

Indeed, in its statement of reasons for adopting the Guideline, the Natural Resources Agency explained the Guideline, which supplanted any earlier, informal technical advice from the Governor's Office of Planning and Research, "reflects the existing CEQA principle that there is no iron-clad definition of 'significance.' [Citations.]  Accordingly, lead agencies must use their best efforts to investigate and disclose all that they reasonably can regarding a project's potential adverse impacts."  (California Natural Resources Agency, Final Statement of Reasons for Regulatory Action (Dec. 2009) p. 20 < http://resources.ca.gov/ceqa/docs/Final_ Statement_of_Reasons.pdf > (as of Nov. 21, 2014).)

Justice Benke's dissenting opinion, filed November 24, 2014, is modified as follows:

1.      On page 8, in the last sentence of the first full paragraph, the words "should be a" are deleted and the word "is" is added following the word "determination."  The sentence shall now read:

To the extent thresholds of significance *other* than the three expressly provided in subdivision (b) apply, that determination is made by an agency in the proper exercise of its discretion.

2.      On page 8, after the first full paragraph ending with the words "exercise of its discretion," the following paragraph is added:

In its petition for rehearing, SANDAG contends that the Natural Resources Agency (NRA) has specifically forgone any recommendation for use of the Executive Order as a CEQA standard in Guidelines section 15064.4, which SANDAG notes was specifically developed at the direction of the Legislature to guide analysis of GHG impacts.  (Petn. for rehg., pp. 4-5.)  The history of Guidelines section 15064.4 is significant.  Following issuance of the Executive Order, in June of 2008, the Governor's Office of Planning and Research (OPR) issued a detailed 20-page technical advisory (<http://opr.ca.gov/ceqa/pdfs/june08-ceqa.pdf> [as of Dec. 2014]; hereafter Advisory.)  Noting that many public agencies were striving to determine the appropriate means by which to evaluate and mitigate the impacts of proposed projects on climate change, the Advisory set forth directions and step-by-step guidance aimed at assisting practitioners and lead agencies.  The Advisory expressly recognizes that the most difficult part of climate change analysis is the determination of significance.  (Advisory, p. 4.)  The Governor's office thus stated, "To this end, OPR has asked [C]ARB technical staff to recommend a method for setting thresholds which will

2

encourage consistency and uniformity in the CEQA analysis of GHG emissions throughout the state. Until such time as state guidance is available on thresholds of significance for GHG emissions, we recommend the following approach to your CEQA analysis." (Advisory, pp. 4, 8-9.) In its "Recommended Approach," the Advisory is clear: It is *lead agencies* that are charged with selecting and implementing significance thresholds. (Advisory pp. 5-7.) Important to our purposes, in the selecting and implementing of significance thresholds, the Advisory gives no authority to the courts and claims no such power for the Governor. At the conclusion of the Advisory, the Governor's office states its intent is to deliver a package of CEQA Guidelines amendments to the Resources Agency by July 1, 2009. (Advisory, p. 9.) As a result of the Advisory, in March of 2010, Guidelines section 15064.4 was passed. It fully implements the intent and language of the Advisory, which nullifies my colleagues' expansive interpretation of the Executive Order.

3.　　On page 8, in the paragraph beginning with "It is apparent," the words "history and" are added to the second sentence, so that it now reads:

　　　　Despite the clear history and language of Guidelines section 15064.4, subdivision (b) and the obvious intent of that section, the majority asserts a right to determine that a gubernatorial policy statement, which does not qualify as a threshold of significance, is to be included among the "other factors" and then *orders* SANDAG on remand to develop an undefined "consistency analysis" between the lead agency's plan and the policy statement.

4.　　On page 14, in the second sentence of the first full paragraph, the words "Office of Planning and Research (OPR)" are replaced with "OPR" and the words "Natural Resources Agency (NRA)" are replaced with "NRA," so that the sentence now reads:
　　　　SB 97 directed the OPR to prepare and submit to the NRA "guidelines for the mitigation of greenhouse gas emissions or the effects of greenhouse gas emissions . . . including, but not limited to, effects associated with transportation or energy consumption."

There is no change in the judgment.

San Diego Association of Governments et al.'s petition for rehearing is denied.

McConnell, P. J.

3

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al.,<br>    Plaintiffs and Appellants,<br><br>v.<br><br>SAN DIEGO ASSOCIATION OF GOVERNMENTS et al.,<br>    Defendants and Appellants;<br>THE PEOPLE,<br>    Intervenor and Appellant. | D063288<br><br><br><br>(Super. Ct. No. 37-2011-00101593-CU-TT-CTL) |
| CREED-21 et al.,<br>    Plaintiffs and Appellants,<br><br>v.<br><br>SAN DIEGO ASSOCIATION OF GOVERNMENTS et al.,<br>    Defendants and Appellants;<br>THE PEOPLE,<br>    Intervenor and Appellant. | (Super. Ct. No. 37-2011-00101660-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Timothy B. Taylor, Judge.  Judgment modified and affirmed.

The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour; and Julie D. Wiley for Defendants and Appellants San Diego Association of Governments et al.

Kamala D. Harris, Attorney General, Timothy R. Patterson and Janill L. Richards, Deputy Attorneys General, for Intervenor and Appellant.

Shute, Mihaly & Weinberger, Rachel B. Hooper, Amy J. Bricker, Erin B. Chalmers; Daniel P. Selmi; Coast Law Group, Marco Gonzalez; Kevin P. Bundy; and Cory J. Briggs for Plaintiffs and Appellants Cleveland National Forest et al.


INTRODUCTION

After the San Diego Association of Governments (SANDAG) certified an environmental impact report (EIR) for its 2050 Regional Transportation Plan/Sustainable Communities Strategy (transportation plan), CREED-21 and Affordable Housing Coalition of San Diego filed a petition for writ of mandate challenging the EIR's adequacy under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1]  Cleveland National Forest Foundation and the Center for Biological Diversity filed a similar petition, in which Sierra Club and the People later joined.

The superior court granted the petitions in part, finding the EIR failed to carry out its role as an informational document because it did not analyze the inconsistency

---

[1]     Further statutory references are also to the Public Resources Code unless otherwise stated.

2

between the state's policy goals reflected in Executive Order S-3-05 (Executive Order) and the transportation plan's greenhouse gas emissions impacts after 2020. The court also found the EIR failed to adequately address mitigation measures for the transportation plan's greenhouse gas emissions impacts. Given these findings, the court declined to decide any of the other challenges raised in the petitions.

SANDAG appeals, contending the EIR complied with CEQA in both respects. Cleveland National Forest Foundation and Sierra Club (collectively, Cleveland) cross-appeal, contending the EIR further violated CEQA by failing to analyze a reasonable range of project alternatives, failing to adequately analyze and mitigate the transportation plan's air quality impacts, and understating the transportation plan's impacts on agricultural lands. The People separately cross-appeal, contending the EIR further violated CEQA by failing to adequately analyze and mitigate the transportation plan's impacts from particulate matter pollution. We conclude the EIR failed to comply with CEQA in all identified respects. We, therefore, modify the judgment to incorporate our decision on the cross-appeals and affirm. In doing so, we are upholding the right of the public and our public officials to be well informed about the potential environmental consequences of their planning decisions, which CEQA requires and the public deserves, before approving long-term plans that may have irreversible environmental impacts.

DISCUSSION

I

A

*General Role of an EIR*

"The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391 (*Laurel Heights*); Guidelines, § 15002.)[2]  "The EIR is the primary means of achieving . . . the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.]  The EIR is therefore 'the heart of CEQA.' [Citations.]  An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.]  The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.]  Because the EIR must

_____

2      All references to Guidelines are to the CEQA Guidelines, which are located in title 14 of the California Code of Regulations beginning at section 15000.  "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448, fn. 4 (*Smart Rail*).)

4

be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

B

*Role of a Program EIR*

The EIR at issue in this case is a program EIR. A "program EIR" is "an EIR which may be prepared on a series of actions that can be characterized as one large project" and are related in specified ways. (Guidelines, § 15168, subd. (a); *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 343 (*Atherton*).) The use of a program EIR can: "(1) Provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action, [¶] (2) Ensure consideration of cumulative impacts that might be slighted in a case-by-case analysis, [¶] (3) Avoid duplicative reconsideration of basic policy considerations, [¶] (4) Allow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts, [and] [¶] (5) Allow reduction in paperwork." (Guidelines, § 15168, subd. (b); *Atherton*, *supra*, at pp. 343-344.)

5

"[W]here an agency prepares a 'program EIR' for a broad policy document . . . , Guidelines section 15168, subdivision (c)(2) allows agencies to limit future environmental review for later activities that are found to be 'within the scope' of the program EIR."  (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 196; accord, *Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 801-802.)  Further environmental review for such activities is required only where "(a) Substantial changes are proposed in the project which will require major revisions of the [EIR].  [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the [EIR].  [¶] (c) New information, which was not known or could not have been known at the time the [EIR] was certified as complete, becomes available."  (§ 21166; *May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1325-1326; accord, *Citizens Against Airport Pollution v. City of San Jose*, *supra*, at p. 802.)

Because of these limitations, once an EIR is finally approved, a court generally cannot compel an agency to perform further environmental review for any known or knowable information about the project's impacts omitted from the EIR.  (*Citizens Against Airport Pollution v. City of San Jose*, *supra*, 227 Cal.App.4th at pp. 807-808; *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 531-532.)  A court also generally cannot compel an agency to perform further environmental review if new regulations or guidelines for evaluating the project's impacts are adopted in the future.  (*Concerned Dublin Citizens v. City of*

6

*Dublin* (2013) 214 Cal.App.4th 1301, 1320; *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1605.)

Hence, "[d]esignating an EIR as a program EIR . . . does not by itself decrease the level of analysis otherwise required in the EIR. 'All EIR's must cover the same general content. [Citations.] The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR.' " (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 533.) Consequently, in considering a challenge to a program EIR, "it is unconstructive to ask whether the EIR provided 'project-level' as opposed to 'program-level' detail and analysis. Instead, we focus on whether the EIR provided 'decision makers with sufficient analysis to intelligently consider the environmental consequences of [the] project.' " (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1052.)

# C

## *Standard of Review in CEQA Cases*[3]

"[I]n a CEQA case, as in other mandamus cases, [our review] is the same as the trial court's:  [we review] the agency's action, not the trial court's decision; in that sense [our review] is de novo.  (*Vineyard*, *supra*, 40 Cal.4th at p. 427.)  However, our inquiry extends " 'only to whether there was a prejudicial abuse of discretion.'  ([§ 21168.5].)" (*Vineyard*, at p. 426.)

"[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.  (§ 21168.5.)  Judicial review of these two types of error differs significantly:  While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)  "In evaluating an EIR for CEQA compliance, then, [we] must adjust [our] scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.

---

3    The California Supreme Court is currently reviewing the standard and scope of judicial review under CEQA.  (*Sierra Club v. County of Fresno* (2014) 226 Cal.App.4th 704 [172 Cal.Rptr.3d 271], review granted Oct. 1, 2014, S219783.)  Pending further guidance, we endeavor to apply the review dichotomy most recently articulated by the Supreme Court.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, 435 (*Vineyard*); accord, *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161-1162 (*Bay-Delta*); *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 944.)

For example, where an agency failed to require an applicant to provide certain information mandated by CEQA and to include that information in its environmental analysis, . . . the agency 'failed to proceed in the manner prescribed by CEQA.' [Citations.]  In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' [citation], the agency's conclusion would be reviewed only for substantial evidence."  (*Ibid.*)

II

*Appeal*

A

*Background*

1

In 2005 then Governor Arnold Schwarzenegger issued the Executive Order establishing greenhouse gas emissions reduction targets for California.  Specifically, the Executive Order required reduction of greenhouse gas emissions to 2000 levels by 2010, to 1990 levels by 2020, and to 80 percent below 1990 levels by 2050.[4]

---

4       "[A]n executive order is generally regarded as 'a formal written directive of the Governor.' "  (75 Ops.Cal.Atty.Gen. 263 (1992).)  The Executive Order provided in relevant part:  "I, ARNOLD SCHWARZENEGGER, Governor of the State of California, by virtue of the power invested in me by the Constitution and statutes of the State of California, do hereby order effective immediately . . . .  That the following greenhouse gas emission reduction targets are hereby established for California:  by 2010, reduce [greenhouse gas] emissions to 2000 levels; by 2020, reduce [greenhouse gas] emissions to 1990 levels; by 2050, reduce [greenhouse gas] emissions to 80 percent below 1990 levels . . . ."  (http://gov.ca.gov/news.php?id=1861 [as of Nov. 21, 2014].)

The Legislature subsequently enacted the California Global Warming Solutions Act of 2006 (Health & Saf. Code, § 38500 et seq.), referred to by the parties as Assembly Bill No. 32 (AB 32). Among its provisions, AB 32 tasked the California Air Resources Board (CARB) with determining the state's 1990 greenhouse gas emissions level and approving an equivalent emissions level to be achieved by 2020. (Health & Saf. Code, § 38550.)

The Legislature intended for the emissions limit to "continue in existence and be used to maintain and continue reductions in emissions of greenhouse gases beyond 2020." (Health & Saf. Code, § 38551, subd. (b).) The Legislature also intended for the emissions limit to work in concert with other environmental protection laws, expressly stating AB 32 does not "relieve any person, entity, or public agency of compliance with other applicable federal, state, or local laws or regulations, including state air and water quality requirements, and other requirements for protecting public health or the environment." (Health & Saf. Code, § 38592, subd. (b).) The Legislature further intended for "the Climate Action Team established by the Governor to coordinate the efforts set forth under [the Executive Order] continue its role in coordinating overall climate policy." (Health & Saf. Code, § 38501, subd. (i).) Thus, the Legislature, through AB 32, effectively endorsed the Executive Order and its overarching goal of ongoing greenhouse gas emissions reductions as state climate policy. (See, e.g., *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1000, 1043-1044, 1051 [subsequent legislative endorsement operates to ratify and validate provisions in Executive Order].)

10

Bolstering this conclusion, the Legislature also enacted the Sustainable Communities and Climate Protection Act of 2008 (Stats. 2008, ch. 728; Stats. 2009, ch. 354, § 5), referred to by the parties as Senate Bill No. 375 (SB 375). In enacting SB 375, the Legislature found automobiles and light trucks are responsible for 30 percent of the state's greenhouse gas emissions. (Stats. 2008, ch. 728, § 1, subd. (a).) Accordingly, SB 375 directed CARB to develop regional greenhouse gas emission reduction targets for automobiles and light trucks for 2020 and 2035. (Gov. Code, § 65080, subd. (b)(2)(A).) The targets established by CARB for the San Diego region require a 7 percent per capita reduction in carbon dioxide emissions by 2020 and a 13 percent per capita reduction by 2035 (compared to a 2005 baseline).[5] CARB must update these targets every eight years until 2050, and may update the targets every four years based on changing factors. (Gov. Code, § 65080, subd. (b)(2)(A)(iv).)

2

The transportation plan, which SANDAG must prepare every four years (23 U.S.C. § 134, subd. (c); Gov. Code, § 65080, subds. (a) & (d)), "serves as the long-range plan designed to coordinate and manage future regional transportation improvements, services, and programs among the various agencies operating within the San Diego region." In enacting SB 375, the Legislature found the state's emissions reductions goals cannot be met without improved land use and transportation policy. Consequently, SB 375 (Gov. Code, § 65080, subd. (b)(2)(B)) mandates the transportation

---

5       The transportation plan meets these limited scope targets (see part II.C.1, *post*).

11

plan include a sustainable communities strategy to, as the EIR states, "guide the San Diego region toward a more sustainable future by integrating land use, housing, and transportation planning to create more sustainable, walkable, transit-oriented, compact development patterns and communities that meet [CARB's greenhouse gas] emissions targets for passenger cars and light-duty trucks." Once the sustainable communities strategy is approved, some transit priority projects consistent with the strategy are exempt from CEQA requirements. Other transit priority projects, residential projects, and mixed-use projects consistent with the strategy are subject to streamlined CEQA requirements. (§§ 21155-21155.4, 21159.28; Guidelines, § 15183.3.)

B

*Greenhouse Gas Emissions Impacts Analysis*

The EIR acknowledged the transportation plan's implementation would lead to an overall increase in greenhouse gas emissions levels; however, the EIR did not analyze whether this consequence conflicted with the Executive Order, or would impair or impede the achievement of the Executive Order's goals. As it did in the EIR and below, SANDAG contends on appeal its decision to omit an analysis of the transportation plan's consistency with the Executive Order (consistency analysis) did not violate CEQA because CEQA does not require such a consistency analysis. Whether the EIR's analysis complies with CEQA depends on whether the analysis reflects a reasonable, good faith effort to disclose and evaluate the transportation plan's greenhouse gas emissions impacts. We review the sufficiency of the analysis in light of what is reasonably foreseeable. (Guidelines, § 15151; *City of Maywood v. Los Angeles Unified School Dist.*

12

(2012) 208 Cal.App.4th 362, 386 (*City of Maywood*); *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 897-898 (*City of Long Beach*).)  As the focus of SANDAG's contention is whether the EIR's analysis was reasonable and not whether the EIR violated a specific statute or regulation, the contention presents a predominately factual question and our review is for substantial evidence.  (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

Substantial evidence for CEQA purposes is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."  (Guidelines, § 15384, subd. (a).)  Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."  (*Id*., subd. (b).)  It does not include argument, speculation, unsubstantiated opinion or narrative, clearly erroneous or inaccurate evidence, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment.  (*Id*., subd. (a).)

"In reviewing for substantial evidence, [we] 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard*, *supra*, 40 Cal.4th at p. 435; *Laurel Heights*, *supra*, 47 Cal.3d at p. 393.)  Rather, we must resolve any reasonable doubts and any conflicts in the evidence in favor of the agency's findings and decision. (*Laurel Heights*, at p. 393; *Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at pp. 522-523.)

13

In this case, SANDAG's decision to omit an analysis of the transportation plan's consistency with the Executive Order did not reflect a reasonable, good faith effort at full disclosure and is not supported by substantial evidence because SANDAG's decision ignored the Executive Order's role in shaping state climate policy. The Executive Order underpins all of the state's current efforts to reduce greenhouse gas emissions. As SANDAG itself noted in its Climate Action Strategy, the Executive Order's 2050 emissions reduction goal "is based on the scientifically-supported level of emissions reduction needed to avoid significant disruption of the climate and *is used as the long-term driver for state climate change policy development*." (Italics added.)

Indeed, the Executive Order led directly to the enactment of AB 32, which validated and ratified the Executive Order's overarching goal of ongoing emissions reductions, recognized the Governor's Climate Action Team as the coordinator of the state's overall climate policy, and tasked CARB with establishing overall emissions reduction targets for 2020 and beyond. The Executive Order also led directly to the enactment of SB 375, which tasked CARB with establishing regional automobile and light truck emissions reduction targets for 2020 and 2035. CARB is required to revisit these targets every eight years through 2050, or sooner if warranted by changing circumstances. (Gov. Code, § 65080, subd. (b)(2)(A)(iv).) Thus, the Executive Order, with the Legislature's unqualified endorsement, will continue to underpin the state's efforts to reduce greenhouse gas emissions throughout the life of the transportation plan. The EIR's failure to analyze the transportation plan's consistency with the Executive Order, or more particularly with the Executive Order's overarching goal of ongoing

14

greenhouse gas emissions reductions, was therefore a failure to analyze the transportation plan's consistency with state climate policy. As evidence in the record indicates the transportation plan would actually be inconsistent with state climate policy over the long term, the omission deprived the public and decision makers of relevant information about the transportation plan's environmental consequences. The omission was prejudicial because it precluded informed decisionmaking and public participation. (*Smart Rail*, *supra*, 57 Cal.4th at p. 463; *City of Long Beach*, *supra*, 176 Cal.App.4th at p. 898.)

SANDAG contends the EIR cannot analyze the transportation plan's consistency with the Executive Order because there is no statute or regulation translating the Executive Order's goals into comparable, scientifically based emissions reduction targets. However, we do not agree the lack of such targets precludes the EIR from performing a meaningful consistency analysis in this instance. "Drafting an EIR . . . necessarily involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.) Although SANDAG may not know precisely what future emissions reduction targets the transportation plan will be required to meet, it knows from the information in its own Climate Action Strategy the theoretical emissions reduction targets necessary for the region to meet its share of the Executive Order's goals. It also knows state climate policy, as reflected in the Executive Order and AB 32, requires a continual *decrease* in the state's greenhouse gas emissions and the transportation plan after 2020 produces a continual *increase* in greenhouse gas emissions. With this knowledge, SANDAG could have reasonably analyzed whether the

15

transportation plan was consistent with, or whether it would impair or impede, state climate policy.[6]

SANDAG's attempts to disavow its responsibility for performing this analysis are unavailing. The Legislature specifically found reducing greenhouse gas emissions cannot be accomplished without improved land use and transportation policy. Accordingly, the transportation plan plays both a necessary and important role in achieving state climate policy. By failing to adequately inform the public and decision makers the transportation plan is inconsistent with state climate policy, the EIR deterred the decision makers from devising and considering changes to favorably alter the trajectory of the transportation plan's post-2020 greenhouse gas emissions. When the decision makers are inevitably faced with post-2020 requirements aligned with state climate policy, their task of complying with these requirements will be more difficult and some opportunities for compliance may be lost. As SANDAG explained in its Climate Action Strategy, "Once in place, land use patterns and transportation infrastructure typically remain part of the built environment and influence travel behavior and greenhouse gas emissions for several decades, perhaps longer." In this regard, the EIR falls far short of being "an

---

6     We do not intend to suggest the transportation plan must achieve the Executive Order's 2050 goal or any other specific numerical goal. Our concern is with the EIR's failure to recognize, much less analyze and attempt to mitigate, the conflict between the transportation plan's long-term greenhouse gas emissions increase and the state climate policy goal, reflected in the Executive Order, of long-term emissions reductions. In fact, the EIR does not even discuss the transportation plan's failure to maintain emissions reductions after 2020, which is AB 32's minimum expectation. (See Health & Saf. Code, § 38551, subd. (b).)

16

'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reach ecological points of no return.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) It also falls far short of " 'demonstrat[ing] to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its actions.' " (*Ibid.*)

We are likewise unpersuaded by SANDAG's assertion the EIR's analysis of the transportation plan's greenhouse gas emissions impacts fully complies with CEQA because it utilized significance thresholds specified in Guidelines section 15064.4, subdivision (b).[7] This Guideline states in relevant part: "A lead agency should consider the following factors, *among others*, when assessing the significance of impacts from greenhouse gas emissions on the environment: [¶] (1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting[.] [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project. [¶] (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution

_____

[7]    "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Guidelines, § 15064.7.)

17

of greenhouse gas emissions.  If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding compliance with the adopted regulations or requirements, an EIR must be prepared for the project." (Guidelines, § 15064.4, subd. (b), italics added.)

Although this Guideline specifies three means of determining whether a project's greenhouse gas emissions impacts are significant, the "among others" qualifying language indicates these means are not exclusive.[8]  Moreover, "the fact that a particular environmental effect meets a particular threshold cannot be used as an automatic determinant that the effect is or is not significant . . . a threshold of significance cannot be applied in a way that would foreclose the consideration of other substantial evidence tending to show the environmental effect to which the threshold relates might be significant."  (*Protect The Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 (*Amador*).)  Consequently, the use of the Guideline's thresholds does not necessarily equate to compliance with CEQA, particularly where, as here, the failure to consider the transportation plan's consistency with the state climate policy of ongoing emissions reductions reflected in the Executive Order frustrates the state climate policy and renders the EIR fundamentally misleading.

---

[8]     Indeed, in its statement of reasons for adopting the Guideline, the Natural Resources Agency explained the Guideline "reflects the existing CEQA principle that there is no iron-clad definition of 'significance.'  [Citations.]  Accordingly, lead agencies must use their best efforts to investigate and disclose all that they reasonably can regarding a project's potential adverse impacts."  (California Natural Resources Agency, Final Statement of Reasons for Regulatory Action (Dec. 2009) p. 20 < http:// resources.ca.gov/ceqa/docs/Final_Statement_of_Reasons.pdf > (as of Nov. 21, 2014).)

We are also unpersuaded by SANDAG's assertion it was not required to analyze the transportation plan's consistency with the state climate policy reflected in the Executive Order because SANDAG has broad discretion to select the criteria it uses to determine the significance of the transportation plan's impacts. While we agree SANDAG has such discretion (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 624), SANDAG abuses its discretion if it exercises it in a manner that causes an EIR's analysis to be misleading or without informational value. (See *Smart Rail*, *supra*, 57 Cal.4th at pp. 445, 457.) "A lead agency cannot avoid finding a potentially significant effect on the environment by rotely applying standards of significance that do not address that potential effect." (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 717, citing *Amador*, *supra*, 116 Cal.App.4th at p. 1111.)

By disregarding the Executive Order's overarching goal of ongoing emissions reductions, the EIR's analysis of the transportation plan's greenhouse gas emissions makes it falsely appear as if the transportation plan is furthering state climate policy when, in fact, the trajectory of the transportation plan's post-2020 emissions directly contravenes it. "[O]mitting material necessary to informed decisionmaking and informed public participation" subverts the purposes of CEQA and "precludes both identification of potential environmental consequences arising from the project and also thoughtful analysis of the sufficiency of measures to mitigate those consequences." (*Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 658.) Such an omission is particularly troubling where, as here, the project under review involves long-term,

19

planned expenditures of billions of taxpayer dollars. No one can reasonably suggest it would be prudent to go forward with planned expenditures of this magnitude before the public and decision makers have been provided with all reasonably available information bearing on the project's impacts to the health, safety, and welfare of the region's inhabitants. We, therefore, conclude SANDAG prejudicially abused its discretion by omitting from the EIR an analysis of the transportation plan's consistency with the state climate policy, reflected in the Executive Order, of continual greenhouse gas emissions reductions.[9]

## C

### *Mitigation of Greenhouse Gas Emissions Impacts*

#### 1

Although the EIR did not analyze the transportation plan's consistency with the state climate policy reflected in the Executive Order, the EIR nevertheless, analyzed the transportation plan's greenhouse gas emissions impacts against three significance thresholds for each of the planning years 2020, 2035, and 2050. Under the first

---

[9]    Our decision will not necessarily stop any project encompassed within the transportation plan. (See *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 286-289.) Our decision also will not procedurally or substantively expand CEQA requirements in violation of section 21083.1 because the EIR is required to analyze the transportation plan's potential "to degrade the quality of the environment, curtail the range of the environment, *or to achieve short-term, to the disadvantage of long-term, environmental goals.*" (§ 21083, subd. (b)(1), italics added; Guidelines, § 15065, subd. (a)(2), (c).) Rather, our decision is consistent with the intent CEQA "be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (Guidelines, § 15003, subd. (f).)

threshold, the EIR posited the transportation plan's impacts would be significant if the transportation plan's implementation were to increase greenhouse gas emissions compared to existing, or 2010, conditions. Under the second threshold, the EIR posited the transportation plan's impacts would be significant if the transportation plan's implementation conflicted with CARB's regional automobile and light truck emissions reductions targets. Under the third threshold, the EIR stated the transportation plan's impacts would be significant if the transportation plan's implementation conflicted with either CARB's Climate Change Scoping Plan (Scoping Plan) or SANDAG's own Climate Action Strategy.[10]

The EIR concluded the transportation plan's greenhouse gas emissions impacts would be significant under the first significance threshold for the 2035 and 2050 planning years because the emissions would be higher in those planning years than in 2010. The EIR concluded the greenhouse gas emissions impacts would be less than significant in all other respects analyzed.[11]

---

[10]     The Scoping Plan is CARB's roadmap for achieving greenhouse gas emissions reductions. The Climate Action Strategy is SANDAG's guide for addressing climate change. The Climate Action Strategy emphasizes the areas where the greatest impact can be made at the local level, including transportation infrastructure.

[11]     The People and Cleveland have not challenged these conclusions and their propriety is not before us. Nonetheless, regarding the third significance threshold, we note the Climate Action Strategy expresses far stronger views than the transportation plan on the steps necessary to achieve the state's long-term greenhouse gas emissions reductions goals. For example, the Climate Action Strategy maintains achieving the goals "will require fundamental changes in policy, technology, and behavior" and "[b]y 2030, the region must have met and gone below the 1990 [emissions] level and be well on its way to doing its share for achieving the 2050 greenhouse gas reduction level."

To mitigate the significant greenhouse gas emissions impacts found under the first threshold, the EIR identified three mitigation measures it deemed feasible.[12] The first mitigation measure required SANDAG to update its future regional comprehensive plans, regional transportation plans, and sustainable communities plans to incorporate policies and measures leading to reduced greenhouse gas emissions. The second mitigation measure encouraged the San Diego region cities and the County of San Diego (County) to adopt and implement climate action plans for reducing greenhouse gas emissions to a level the particular city or the County determined would not be cumulatively considerable. The second mitigation measure also identified various provisions the plans should include and stated SANDAG would assist in the preparation of the plans and other climate strategies through the continued implementation of its own Climate Action Strategy and Energy Roadmap Program.[13] The third mitigation measure stated SANDAG would and other agencies should require the use of best available control technology to reduce greenhouse gas emissions during the construction and operation of projects.

---

[12] " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.)

[13] According to the record, the Energy Roadmap Program "identifies energy-saving measures that can be integrated into local planning and permitting processes, ordinances, outreach and education efforts, and municipal operations."

According to the EIR, these mitigation measures encourage reduction in greenhouse gas emissions, but they do not provide a mechanism guaranteeing such reductions. Consequently, the EIR concluded the significant impacts found under the first threshold would remain significant and unavoidable.

The EIR also considered and rejected three other mitigation measures deemed infeasible. These mitigation measures were: (1) requiring all vehicles driven within the region to be zero-emission vehicles or to be powered by renewable energy; (2) requiring all future construction to be net-zero energy use; and (3) requiring all future construction activity to include only equipment retrofitted to significantly reduce greenhouse gas emissions.

3

SANDAG contends the EIR adequately addressed mitigation for the transportation plan's significant greenhouse gas emissions impacts. Given our conclusion in part II.B, *ante*, this challenge is at least partially moot as the additional analysis necessary to properly address the transportation plan's consistency with the state climate policy reflected in the Executive Order will likely require revisions to related sections of the EIR, including the EIR's discussion of mitigation measures. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 91 [once a lead agency recognizes an impact is significant, the agency must describe, evaluate, and adopt

feasible mitigation measures to mitigate or avoid the impact].)[14] We, nonetheless,

briefly address SANDAG's contention. As this contention is predominately factual, our

review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

a

"The core of an EIR is the mitigation and alternatives sections." (*Citizens of

Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; *Watsonville Pilots

Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1089.) "Section 21002

requires agencies to adopt feasible mitigation measures to substantially lessen or avoid

otherwise significant adverse environmental impacts. [¶] The CEQA guidelines state that

to be legally adequate mitigation measures must be capable of: '(a) Avoiding the impact

altogether by not taking a certain action or parts of an action. (b) Minimizing impacts by

limiting the degree or magnitude of the action and its implementation. (c) Rectifying the

impact by repairing, rehabilitating, or restoring the impacted environment. (d) Reducing

or eliminating the impact over time by preservation and maintenance operations during

the life of the action.' [Citation.]

"For each significant effect, the EIR must identify specific mitigation measures;

where several potential mitigation measures are available, each should be discussed

separately, and the reasons for choosing one over the others should be stated. If the

---

14     We do not express any view on precisely how SANDAG must remedy the analytical deficiencies identified in this opinion as we recognize a court may direct SANDAG to comply with CEQA, but a court may not direct SANDAG to exercise its discretion in a particular fashion or to produce a particular result. (§ 21168.9, subd. (c); *Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1266.)

24

inclusion of a mitigation measure would itself create new significant effects, these too, must be discussed, though in less detail than required for those caused by the project itself."  (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027.)

For significant greenhouse gas emissions effects, feasible mitigation measures may include:  "(1) Measures in an existing plan or mitigation program for the reduction of emissions that are required as part of the lead agency's decision; [¶] (2) Reductions in emissions resulting from a project through implementation of project features, project design, or other measures . . . ; [¶] (3) Off-site measures, including offsets that are not otherwise required, to mitigate a project's emissions; [¶] (4) Measures that sequester greenhouse gases; [¶] [and] (5) In the case of the adoption of a plan, such as a general plan, long range development plan, or plans for the reduction of greenhouse gas emissions, mitigation may include the identification of specific measures that may be implemented on a project-by-project basis.  Mitigation may also include the incorporation of specific measures or policies found in an adopted ordinance or regulation that reduces the cumulative effect of emissions."  (Guidelines, § 15126.4, subd. (c).)

b

At one extreme, the EIR in this case considered and deemed feasible three measures requiring little to no effort to implement and assuring little to no concrete steps toward emissions reduction.  In addition, according to the EIR, many of the suggestions contained in these measures have already been incorporated into the transportation plan and, by implication, the transportation plan's emissions estimates.  "A 'mitigation measure' is a suggestion or change that would reduce or minimize significant adverse

25

impacts on the environment caused by the project as proposed." (*Lincoln Place Tenants Association v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 445.) A mitigation measure is not part of the project. (*Lotus v. Department of Transportation*, *supra*, 223 Cal.App.4th at p. 656 & fn. 8.) Thus, it is questionable whether these measures even qualify as mitigation measures.

At the other extreme, the EIR considered and deemed infeasible three particularly onerous measures. Each of the measures would be difficult, if not impossible, to enforce and each requires implementation resources not readily available. Unrealistic mitigation measures, similar to unrealistic project alternatives, do not contribute to a useful CEQA analysis. (See *Watsonville Pilots Assn. v. City of Watsonville*, *supra*, 183 Cal.App.4th at p. 1089; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2014) § 15.10, pp. 15-16.) As none of these measures had any probability of implementation, their inclusion in the EIR was illusory.

Missing from the EIR is what CEQA requires: a discussion of mitigation alternatives that could both substantially lessen the transportation plan's significant greenhouse gas emissions impacts and feasibly be implemented. (*Lincoln Place Tenants Association v. City of Los Angeles*, *supra*, 155 Cal.App.4th at p. 445.) A few examples of potential alternatives identified in the Climate Action Strategy include: supporting the planning and development of smart growth areas through transportation investments and other funding decisions; offering incentives for transit-oriented developments in smart growth areas; coordinating the funding of low carbon transportation with smart growth development; and encouraging parking management measures that promote walking and

26

transit use in smart growth areas. Given the absence of any discussion of such mitigation alternatives, we conclude there is not substantial evidence to support SANDAG's determination the EIR adequately addressed mitigation for the transportation plan's greenhouse gas emissions impacts. The error is prejudicial because it precluded informed public participation and decisionmaking. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

## III

### *Cross-Appeals*

### A

### *Forfeiture*

The People's and Cleveland's pleadings and briefs below challenged many aspects of the EIR in addition to the EIR's analysis and mitigation of greenhouse gas emissions impacts. In its tentative ruling, the superior court acknowledged the other challenges, but determined it could resolve the case solely on the greenhouse gas emissions impacts analysis and mitigation issues and, consequently, it did not need to address the other challenges. The People and Cleveland through their cross-appeals now seek rulings from this court on many of the other challenges. SANDAG contends they forfeited these challenges by failing to attempt to obtain rulings on them below.

Even if SANDAG's contention were correct, the application of the forfeiture rule is not automatic and we may excuse forfeiture in cases presenting "an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) We are persuaded the legal issues raised in the cross-appeals are sufficiently important we should exercise our discretion to

27

excuse any forfeiture.  Moreover, we are mindful of the Legislature's intent "that any court, which finds, or, in the process of reviewing a previous court finding, finds, that a public agency has taken an action without compliance with [CEQA], shall specifically address each of the alleged grounds for noncompliance."  (§ 21005, subd. (c).)

B

*Project Alternatives*

1

The EIR analyzed seven project alternatives.  They were:

1.      A no project alternative, which assumed the transportation plan would not be adopted and only transportation improvements under construction or development would be built (Alternative 1);

2.      A modified funding strategy alternative, which deleted some highway improvements, delayed other highway improvements, added some transit projects, advanced other transit projects, and increased some transit service frequencies (Alternative 2a);

3.      The same modified funding strategy alternative coupled with a modified "smart growth" land use pattern, which assumed added infill and redevelopment to increase residential development density in urban and town center areas and increased employment within job centers (Alternative 2b);

4.      A transit emphasis alternative, which advanced the development of some transit projects, but did not add any new transit projects (Alternative 3a);

28

5.　　The same transit emphasis alternative, but assuming the modified smart growth land use pattern (Alternative 3b);

6.　　An alternative implementing the transportation plan's transportation network, but assuming the modified smart growth land use pattern (Alternative 4); and

7.　　A slow growth alternative, which assumed the application of regulations and/or economic disincentives to slow population and employment and delayed the complete implementation of the transportation plan by five years (Alternative 5).

## 2

Cleveland contends the EIR fails to comply with CEQA because the EIR did not analyze a reasonable range of project alternatives. As the focus of this contention is whether the analysis was reasonable and not whether it occurred, the contention presents a predominately factual question and our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts. [Citations.] The [Guidelines] state that an EIR must 'describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . .' [Citation.] An EIR need not consider every conceivable alternative to a project or alternatives that are infeasible. [Citations.] [¶] . . . [¶]

29

" 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' [Citation.] The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' [Citations.] An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' " (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1163, fn. omitted.) A court will uphold the selection of project alternatives unless the challenger demonstrates " 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 988.)

In this case, the EIR's discussion of project alternatives is deficient because it does not discuss an alternative which could significantly reduce total vehicle miles traveled. Although Alternatives 3a and 3b are labeled "transit emphasis" alternatives, the labeling is a misnomer. These alternatives mainly advance certain rapid bus projects, but leave the planned rail and trolley projects largely unchanged. In addition, these alternatives do not provide any new transit projects or significant service increases. In fact, the "transit emphasis" alternatives include fewer transit projects than some of the other non-"transit-emphasis" alternatives.

The omission of an alternative which could significantly reduce total vehicle miles traveled is inexplicable given SANDAG's acknowledgment in its Climate Action Strategy that the state's efforts to reduce greenhouse gas emissions from on-road

30

transportation will not succeed if the amount of driving, or vehicle miles traveled, is not significantly reduced. The Climate Action Strategy explained, "Lowering vehicle miles traveled means providing high-quality opportunities to make trips by alternative means to driving alone such as walking, bicycling, ridesharing, and public transit, and by shortening vehicle trips that are made. This can be accomplished through improved land use and transportation planning and related measures, policies and investments that increase the options people have when they travel." Accordingly, the Climate Action Strategy recommended policy measures to increase and prioritize funding and system investments for public transit and transit operations, increase the level of service on existing routes and provide new public transit service through expanded investments, and improve the performance of public transit with infrastructure upgrades. Given these recommendations, their purpose, and their source, it is reasonable to expect at least one project alternative to have been focused primarily on significantly reducing vehicle trips.

Instead, it appears the project alternatives focused primarily on congestion relief. The Climate Action Strategy provides evidentiary support for the consideration of congestion relief alternatives as it notes, "Eliminating or reducing congestion can lead to more efficient travel conditions for vehicles and greenhouse gas savings." However, the transportation plan is a long-term plan and congestion relief is not necessarily an effective long-term strategy. As the Climate Action Strategy explains, "Measures to relieve congestion also may induce additional vehicle travel during uncongested periods, particularly over the long-term, which can partially or fully offset the greenhouse gas reductions achieved in the short-term from congestion relief. Induced demand

31

(sometimes called the rebound effect) in transportation refers to the increase in travel that can occur when the level of service on a roadway or other facility improves. Travelers sometimes respond to faster travel times and decreased costs of travel by traveling more, resulting in increased vehicle miles traveled." (Fns. omitted.) Given the acknowledged long-term drawbacks of congestion relief alternatives, there is not substantial evidence to support the EIR's exclusion of an alternative focused primarily on significantly reducing vehicle trips. The error is prejudicial because it precluded informed public participation and decisionmaking. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

C

*Air Quality Impacts*

1

Eleven air quality monitoring stations throughout the region measure ambient air pollutant concentrations to determine whether the region's air quality meets federal and state standards. The region does not meet the state standards for emissions of respirable particulate matter with an aerodynamic resistance diameter of 10 micrometers or less ($PM_{10}$) and fine particulate matter with an aerodynamic resistance diameter of 2.5 micrometers or less ($PM_{2.5}$).[15] The EIR forecasted the daily tonnage of on-road mobile emissions of $PM_{10}$ and $PM_{2.5}$ from the transportation plan's transportation network

---

[15] According to the EIR, "respirable" means the particulate matter can "avoid many of the human respiratory system defense mechanisms and enter deeply into the lung."

improvements would steadily and substantially increase from 2010 to 2050. The EIR did not forecast whether there would be any increase in these emissions from regional growth or land use changes associated with the transportation plan. Instead, the EIR indicated such forecasting would be done during the next tier of environmental review.

Five of the region's air quality monitoring stations also sample toxic air contaminants (TACs), which are contaminants known or suspected to cause cancer or serious health problems, but for which there are no federal or state ambient air quality standards. State law also requires facilities to report any emissions of TACs in order to quantify the amount released, the location of the release, the concentrations to which the public is exposed, and the resulting potential health risk. (Health & Saf. Code, § 44300 et seq.) In 2009, annual emissions of TACs in the region were estimated to be more than 64.9 million pounds.

According to the EIR, exposure to TACs can cause cancer and other serious health problems. This is especially true of exposure to diesel particulate matter, which is respirable (see fn. 15, *ante*). The EIR further explained, "The carcinogenic potential of TACs is a particular public health concern because many scientists currently believe that there is no 'safe' level of exposure to carcinogens. Any exposure to a carcinogen poses some risk of contracting cancer."

One of the thresholds the EIR used to determine the significance of the transportation plan's air quality impacts was whether sensitive receptors would be exposed to substantial pollutant concentrations. For purposes of this threshold, "sensitive

receptors" included children, the elderly, and communities already experiencing high levels of air pollution and related diseases.

As to $PM_{10}$ and $PM_{2.5}$ emissions, the EIR indicated sensitive receptors could be significantly impacted if they were located near congested intersections. As to TACs, the EIR indicated TACs emitted from highway vehicles and nonroad equipment tend to impact those closest to the emission sources. The EIR explained, "[a] growing body of scientific evidence shows that living or going to school near roadways with heavy traffic volumes is associated with a number of adverse effects. These include increased respiratory symptoms, increased risk of heart and lung disease, and elevated mortality rates."

Although the EIR recognized regional growth and land use changes associated with the transportation plan had the potential to expose sensitive receptors to substantial localized pollutant concentrations, the EIR stated the level of exposure could not and would not be determined until the next tier of environmental review when facility designs of individual projects became available. The EIR made identical statements regarding proposed transportation improvements associated with the transportation plan.

The EIR summarized several studies linking proximity to heavily traveled roads and freeways to harmful health effects to children. The EIR also noted CARB had estimated the region's health risk from diesel particulate matter in 2000 was 720 excess cancer cases per million and had recommended sensitive land uses not be sited within 500 feet of a freeway, urban roads with 100,000 vehicles per day, and rural roads with 50,000 vehicles per day.

Cleveland contends the EIR's air quality impacts analysis violates CEQA because the EIR's description of existing conditions does not adequately depict the public's existing exposure to TACs. Cleveland contends the existing conditions description also fails to identify the approximate number and location of sensitive receptors near planned transportation projects. SANDAG, however, asserts its existing conditions description is sufficiently detailed for a program level EIR. As these contentions focus on the reasonableness of the EIR's analysis, they present predominately factual questions and our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435; accord, *Smart Rail*, *supra*, 57 Cal.4th at pp. 447-449; *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328.)

To fulfill its information disclosure function, "an EIR must delineate environmental conditions prevailing absent the project, defining a baseline against which predicted effects can be described and quantified." (*Smart Rail*, *supra*, 57 Cal.4th at p. 447; see *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 953 [without an adequate baseline description, "analysis of impacts, mitigation measures and project alternatives becomes impossible"]; Guidelines, § 15125, subd. (a).)[16] If the description of the environmental setting " 'is inaccurate, incomplete or

---

[16]    Guidelines section 15125, subdivision (a), provides: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and

misleading, the EIR does not comply with CEQA. [Citation.] "Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the [EIR] adequately investigated and discussed the environmental impacts of the development project." ' " (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 219.)

In this case, for TACs exposures, the record shows there was available data from monitoring stations and mandatory reports with which SANDAG could have developed a reasoned estimate of the region's existing TACs exposures. Likewise, for sensitive receptors, the record shows SANDAG has data showing current population and land use patterns and current transportation infrastructure from which it could have developed a reasoned estimate of the number and location of sensitive receptors adjacent to highways and heavily traveled roadways.

The fact more precise information may be available during the next tier of environmental review does not excuse SANDAG from providing what information it reasonably can now. (Guidelines, § 15144.) Moreover, if known impacts are not analyzed and addressed in a program EIR, they may potentially escape analysis in a later tier EIR. (§ 21166; *Citizens Against Airport Pollution v. City of San Jose*, *supra*, 227 Cal.App.4th at pp. 807-808; *Concerned Dublin Citizens v. City of Dublin*, *supra*, 214 Cal.App.4th at p. 1320; *Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at pp. 531-532; *Fort Mojave Indian Tribe v.*

regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."

36

*Department of Health Services*, *supra*, 38 Cal.App.4th at p. 1605.)  We, therefore, conclude there is not substantial evidence to support SANDAG's determination it could not reasonably provide additional baseline information in the EIR about TACs exposures and the location of sensitive receptors.  The error is prejudicial because it precluded informed public participation and decisionmaking.  (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

3

Both the People and Cleveland contend the EIR's analysis of air quality impacts fails to comply with CEQA because it fails to correlate the transportation plan's adverse air quality impacts to resulting adverse health impacts.  SANDAG again contends its disclosure efforts are adequate for the program level of environmental review and producing additional information at this level is infeasible.  As with the parties' other contention, this contention is predominantly factual and our review is for substantial evidence.  (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"Guidelines section 15126.2, subdivision (a) requires an EIR to discuss, inter alia, 'health and safety problems caused by the physical changes' that the proposed project will precipitate."  (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1219 (*Bakersfield Citizens*).)  Accordingly, an EIR must identify and analyze the adverse health impacts likely to result from the project's air quality impacts.  (*Id.*, at p. 1220; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.*, *supra*, 91 Cal.App.4th at pp. 1367-1371.)

Here, the EIR identified in a general manner the adverse health impacts that might result from the transportation plan's air quality impacts. However, the EIR failed to correlate the additional tons of annual transportation plan-related emissions to anticipated adverse health impacts from the emissions. Although the public and decision makers might infer from the EIR the transportation plan will make air quality and human health worse, at least in some respects for some people, this is not sufficient information to understand the adverse impact. (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1220 [EIR analysis of air quality impacts deficient where public would have no idea of the health consequences of increased air pollution].)

While SANDAG contends it is not feasible to provide more definite information at this juncture, we have not located nor has SANDAG identified any evidence in the record supporting this contention. Instead, SANDAG impermissibly relies solely on its own bald assertions of infeasibility contained in the EIR. (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 385 [an EIR must contain facts and analysis, not just the agency's bare conclusions].) Certainly, we recognize there are limitations to the precision of a program-level analysis. SANDAG is nonetheless obliged to disclose what it reasonably can about the correlation, it has not done so, and there is not substantial evidence showing it could not do so. The error is prejudicial because it precluded informed public

participation and decisionmaking.[17] (§ 21005, subd. (a); *City of Maywood*, *supra*, at p. 386.)

4

a

To mitigate the transportation plan's air quality impacts, the EIR identified the following mitigation measures:

1.      Local jurisdictions should incorporate into their land use decisions certain measures recommended by the California Attorney General for reducing greenhouse gas emissions.

2.      At the next tier of environmental review, SANDAG will and other implementing agencies should incorporate certain dust control measures into project specifications for transportation network improvements.

3.      At the next tier of environmental review, SANDAG will and other implementing agencies should require any heavy duty off-road vehicles used to construct transportation network improvements to utilize all feasible measures to reduce specified emissions to a less than significant level.

4.      At the next tier of environmental review, SANDAG will and other implementing agencies should evaluate potential impacts from carbon monoxide, $PM_{10}$

_____

[17]     Given this conclusion and its bases, we need not decide the People's conditional motion for judicial notice of examples of correlative information contained in comparable EIRs from other jurisdictions.

39

and $PM_{2.5}$ emissions and their health risks and, if required, add one or more recommended mitigation measures to reduce the emissions.

The EIR further concluded these were the only mitigation measures available at the program-level of environmental review.

b

Both the People and Cleveland contend these measures, except for the second, violate CEQA because they improperly defer mitigation of the transportation plan's significant air quality impacts. SANDAG once more counters these measures are adequate for the program level of environmental review.

This issue, like the issue involving the mitigation of greenhouse gas emissions impacts, is at least partially moot given our conclusion in parts III.C.2 & 3, *ante*, as the additional analysis necessary to correct the noted deficiencies will likely require revisions to related sections of the EIR, including the discussion of mitigation measures. (*Communities for a Better Environment v. City of Richmond*, *supra*, 184 Cal.App.4th at p. 91.) However, we briefly address the People's and Cleveland's contentions. As these contentions are predominantly factual, our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"An EIR shall describe feasible measures which could minimize significant adverse impacts. (Guidelines, § 15126.4, subd. (a)(1).) An EIR may not defer the formulation of mitigation measures to a future time, but mitigation measures may specify performance standards which would mitigate the project's significant effects and may be accomplished in more than one specified way. (*Id*., subd. (a)(1)(B).)

40

"Thus, ' " 'for [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated.' " ' [Citation.] Conversely, ' "[i]mpermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR." ' " (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 280-281.)

In this case, with one exception, the EIR defers the analysis of appropriate mitigation measures. It also fails to set performance standards and commit SANDAG to complying with them. Although SANDAG contends no other mitigation is feasible at the program level of environmental review, we have not located nor has SANDAG pointed to any evidence in the record supporting this contention. Accordingly, we conclude there is not substantial evidence to support SANDAG's determination the EIR adequately addressed mitigation for the transportation plan's air quality impacts. The error is prejudicial because it precluded informed public participation and decisionmaking. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

41

D

*Agricultural Impacts*

1

The EIR evaluated the transportation plan's agricultural impacts under two significance thresholds. Under the first threshold, the EIR evaluated the impacts to land designated prime farmland, unique farmland or farmland of statewide significance under the California Resources Agency's Farmland Mapping and Monitoring Program.[18] The EIR concluded implementation of the transportation plan would result in the conversion of 3,485.09 acres of such farmland by 2050.

Under the second threshold, the EIR evaluated impacts to all land with existing agricultural uses regardless of classification, lands subject to Williamson Act contracts, and lands designated under the California Farmland Conservancy Program Act.[19] The EIR concluded implementation of the transportation plan would result in the conversion

_____

[18] According to the EIR, the Farmland Mapping and Monitoring Program is used to identify agricultural resources of 10-acres or more. "Farmlands are classified according to soil factors, including available water holding capacity, temperature regime, acidity, depth to the water table, electrical conductivity, flooding potential, erosion hazard, permeability, rock content, and rooting depth. The best quality land is identified as Prime Farmland and Farmland of Statewide Importance."

[19] According to the EIR, "the Williamson Act [Gov. Code, § 51200 et seq.] enables local governments to enter into contracts with private landowners for the purpose of restricting specific parcels of land to agricultural or related open space use. In return, landowners receive property tax assessments that are much lower than normal because they are based upon farming and open space uses as opposed to full market value."

The California Farmland Conservancy Program Act (§ 10200 et seq.) encourages "the long-term, private stewardship of agricultural lands through the voluntary use of agricultural conservation easements."

of 7,023.07 acres of such land by 2050.  The conclusion was based on data from the Farmland Mapping and Monitoring Program augmented with data from SANDAG's own geographic information system.

2

a

Cleveland contends the EIR violates CEQA by understating the transportation plan's growth-induced impacts on agricultural lands.  As this contention is predominantly factual, our review is for substantial evidence.  (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

As we have previously indicated, when reviewing the adequacy of an EIR's disclosures, we are chiefly concerned with whether the EIR reasonably fulfills its function of facilitating informed decisionmaking.  An analysis which understates the severity of a project's impacts "impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of the project approval."  (*Citizens to Pres. the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 431.)

In this case, both of the data sets used to analyze the transportation plan's agricultural impacts have important limitations.  The Farmland Mapping and Monitoring Program does not capture information for farmland under 10 acres.  In addition, according to SANDAG, its own geographic information system's inventory of agricultural land may not include any agricultural lands that went into production after the mid-1990s.  The combined effect of these limitations is that there is not substantial evidence to show the EIR's analysis accounted for impacts to farmland of less than 10

43

acres put into production within the last 20 years. The error necessarily prejudiced informed public participation and decisionmaking because 68 percent of the farmland in the County is between one and nine acres, with the average farm size being four acres. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

While SANDAG correctly points out CEQA permits the use of data from the Farmland Mapping and Monitoring Program to analyze a project's agricultural impacts (Guidelines, Exhibit G), CEQA does not mandate the use of such data nor does it insulate an EIR from further scrutiny if the EIR relies on the data. Moreover, because the transportation plan included the sustainable communities strategy, SANDAG was required by statute to "gather and consider the best practically available scientific information regarding resource areas and farmland in the region . . . ." (Gov. Code, § 65080, subd. (b)(2)(B)(v).) By choosing a methodology with known data gaps, SANDAG produced unreliable estimates of the amount of existing farmland and, consequently, unreliable estimates of the transportation plan's impacts to existing farmland. Accordingly, SANDAG failed to comply with its statutory obligation as well as CEQA's information disclosure requirements.

b

Finally, in addition to Cleveland's general contention that the EIR understated the transportation plan's agricultural impacts, Cleveland raises two specific contentions: (1) the EIR failed to disclose and analyze the transportation plan's impacts to small farms; and (2) the EIR's discussion of impacts to agricultural land from growth inaccurately assumed land converted to a rural residential designation would remain farmland.

44

SANDAG counters Cleveland is precluded under section 21177, subdivision (a), from raising these two specific contentions because Cleveland never exhausted its administrative remedies as to them.[20]  Except to the extent the specific contentions are subsumed within the general contention, we agree.

"A CEQA challenge is not preserved 'unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing . . . .'  [Citation.]  'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.'  [Citation.]

" 'To advance the exhaustion doctrine's purpose "[t]he 'exact issue' must have been presented to the administrative agency . . . ."  [Citation.]  While " 'less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding' because, . . . parties in such proceedings generally are not represented by counsel . . . ' [citation]" [citation], "generalized environmental comments at public hearings," "relatively . . . bland and general references to environmental matters" [citation], or "isolated and unelaborated comment[s]" [citation] will not suffice.  The same is true for " '[g]eneral objections to project approval . . . .'  [Citations.]"  [Citation.]

---

20     Section 21177, subdivision (a), provides:  "An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination."

" '[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' " ' [Citation.]

" ' "The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]" [Citation.] An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies.' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at p. 527.)

Cleveland has not met its burden in this case. Before SANDAG approved the EIR, Cleveland submitted a letter commenting on the EIR's analysis of agricultural impacts from growth as follows: "[T]he [EIR] states that approximately 10,500[21] acres of agricultural land will be impacted due to regional growth and land use change by the year 2050. [Citations.] The [EIR] also acknowledges that its regional growth projections are based on current planning assumptions for San Diego County and the jurisdictions therein. [Citation.] However, the EIR for the County's current General Plan update, which by definition reflects current planning assumptions (as of 2011), shows that the General Plan expects *55,963* acres of agricultural land to convert to non-agricultural uses by the year 2030. [Citation.] Even though they account for conditions expected to exist 20 years sooner, these impacts are more than five times greater than the impacts identified in the [transportation plan's EIR].

---

21    This figure apparently represents the combined total of the impacts identified under both significance thresholds (see part III.D.1, *ante*).

"It is not clear how the [EIR] could use current planning assumptions for growth and determine that there will be only 10,500 acres of agricultural land impacted, when the current plans on which it bases its assumptions assume there will be more than five times as many acres impacted. SANDAG must explain if there is a basis for this discrepancy. Without any such explanation, the [EIR] appears to severely underestimate the amount of agricultural land that will be impacted, in contravention of CEQA. [¶] In sum, the [EIR's] failure to accurately account for impacts to agricultural land renders it inadequate as a matter of law."

Even read liberally, Cleveland's comment letter did not fairly apprise SANDAG that Cleveland had specific concerns about the EIR's handling of impacts to small farms and lands redesignated rural residential. Instead, Cleveland's comment letter focused on the discrepancy between SANDAG's estimate of overall growth-induced impacts and the County's estimate of overall growth-induced impacts. Cleveland cites to no other place in the record where any other person or organization raised specific concerns about the EIR's handling of impacts to small farms and lands designated rural residential. Consequently, Cleveland has not demonstrated exhaustion of administrative remedies as to these concerns.

DISPOSITION

The matter is remanded to the superior court with directions to modify the judgment and writ of mandate to incorporate our decision on the cross-appeals.  The judgment is affirmed as so modified.  The People and Cleveland are awarded their appeal and cross-appeal costs.

McCONNELL, P. J.

I CONCUR:

IRION, J.

BENKE, J., Dissenting.

My colleagues and I have vastly different views on the extent to which this court can and should control environmental review of the planning decisions of a regional transportation agency such as the San Diego Association of Governments (SANDAG). Where the majority, as a result of the alleged inadequacy of the environmental impact report's (EIR) analysis of greenhouse gas (GHG) impacts, would strike down the EIR implementing SANDAG's regional transportation plan (RTP) calling for investment of about $214 billion over the next several decades in the San Diego region, I would not. Where the majority purports to enforce the California Environmental Quality Act (CEQA) and its Guidelines,[1] I believe my colleagues weaken and confuse the law. Thus, although I conclude that substantial evidence supports the finding SANDAG's GHG impacts analysis is CEQA-compliant, I preface that substantial evidence analysis with the following observations and concerns.

In order to understand the full impact of my colleagues' decision regarding the adequacy of SANDAG's assessment of the GHG impacts of the project, it is first necessary to define a "threshold of significance." CEQA requires "[a]ll public agencies . . . adopt by ordinance, resolution, rule, or regulation, objectives, criteria, and procedures for the evaluation of projects and the preparation of environmental impact reports." (Pub. Resources Code, § 21082.)[2] Such "objectives, criteria, and procedures" are also known

---

[1]     Citations to "Guidelines" refer to California Code of Regulations, title 14, section 15000 et seq., which are the guidelines for the application of CEQA. (Cal. Code Regs., tit. 14, §§ 15000, 15001.)

[2]     All further statutory citations refer to the Public Resources Code unless otherwise indicated.

as "thresholds of significance" and are used by an agency as a benchmark in determining the significance of environmental effects of a project. (Guidelines, § 15064.7, subd. (a).) A threshold of significance for GHG impacts *may* be accompanied by a plan to achieve the reduction or mitigation of GHG emissions, but the plan *must* be adopted through a public review process. (Guidelines, § 15064.4, subd. (b)(3).)

Executive Order No. S-3-05, signed in 2005 by then Governor Arnold Schwarzenegger (Executive Order), does not unilaterally qualify as a threshold of significance. To reach this conclusion, one need go no further than our Supreme Court's opinion of *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 (*Professional Engineers*). In *Professional Engineers*, the court concluded that an executive order, which attempted to implement a mandatory furlough program during our state's fiscal crisis, had no foundation in the state constitution or existing statutes. In particular, the court noted "the Governor fails to cite any judicial decision or other supporting authority holding or suggesting that the power under the California Constitution to establish or revise the terms and conditions of state employment, even in a fiscal emergency, resides in the Governor (or any other executive officer or entity) rather than in the Legislature. To the contrary, the following is well established: (1) Under the California Constitution it is *the Legislature,* rather than the Governor, that generally possesses the ultimate authority to establish or revise the terms and conditions of state employment through legislative enactments, and (2) any authority that the Governor or an executive branch entity . . . is entitled to exercise in this area emanates from the Legislature's delegation of a portion of its legislative authority to such executive officials or entities through statutory enactments." (*Id.* at p. 1015.)

2

The court in *Professional Engineers* likewise rejected the Governor's argument that his power to impose a mandatory work furlough program through an executive order was supported by statutes, including several specific statutory provisions. Among the factors noted contrary to this position, the court recognized that "the Legislature has demonstrated a special interest in retaining . . . [the] ultimate control over the salary and wages of such employees." (*Professional Engineers*, *supra*, 50 Cal.4th at p. 1024.) The court held that the mandatory furlough program was valid *only* because the Legislature, "*through the exercise of its own legislative prerogative*," independently adopted the program. (*Id.* at p. 1047.)

Similarly, the Executive Order at issue in this case, which includes *statewide* GHG reduction targets for 2020, 2035 and 2050, was at its inception merely a broad policy statement of goals issued by the Governor. Like the order at issue in *Professional Engineers*, it too does not have an identifiable foundation in the constitutional power of the Governor or in statutory law.

The majority cites no judicial decision or other supporting authority holding or even suggesting that the power to establish thresholds of significance, qualitative or quantitative, resides in the Governor rather than in the Legislature. Nor is there any authority supporting the view that the Legislature has delegated to the Governor any power to enact or establish thresholds of significance, including with respect to GHG at issue in this case.

To the contrary, as I discuss, the Legislature has clearly demonstrated it intends to retain ultimate control over the regulation of environmental planning. It has vested in the California Air Resources Board (CARB) the responsibility for coordinating efforts to

3

attain and maintain ambient air quality standards, to conduct research into the causes of and solution to air pollution, and systematically attack the serious problem caused by motor vehicles. (Health & Saf. Code, § 39003.) It also has limited by statute the ability of courts to add substantive or procedural requirements to CEQA provisions. (Pub. Resources Code, § 21083.)

The majority is either unable or unwilling to expressly declare its position on whether the Executive Order is a threshold of significance as that term is employed in CEQA analysis. I sympathize with their apparent uneasiness. If the majority declares the Executive Order *is* a threshold of significance, it is faced with the reality that the Executive Order simply does not meet the requirements necessary to have attained that status. If it expressly acknowledges that the Executive Order is *not* a threshold of significance, then it must also acknowledge that SANDAG is quite correct that it was not required to employ it as a CEQA measuring stick in assessing compliance.

My colleagues attempt to avoid the dilemma altogether. They offer that the *policy* underlying the Executive Order is of such overarching importance that it *must* be included within the significance factors listed in Guidelines section 15064.4, subdivision (b), and, therefore, SANDAG was *required* to consider that policy in what they euphemistically refer to as a "consistency analysis" involving the GHG impacts of its project and the Executive Order. Because SANDAG failed to provide such a policy analysis in its EIR, my colleagues conclude SANDAG abused its discretion. By this exercise in linguistics, the majority in contravention of *Professional Engineers* has elevated the Executive Order to the status of a threshold of significance without ever having to expressly declare they are doing so. Its action is judicial fiat, pure and simple.

4

The majority seeks support for its new formulation of the law by noting that important legislation has sprung from the Executive Order, and they offer that the Executive Order will continue to be the springboard for legislative action. Relying on *Professional Engineers*, the majority also concludes the policy underlying the Executive Order has been "ratified" by subsequent legislation. (Maj. opn. *ante*, at p. 14.) If, by this reasoning, the majority implies that subsequent environmental legislation somehow bestowed on the Executive Order a power it did not have, I believe it is mistaken. As *Profession Engineers* recognizes, our Legislature acts independently. As I discuss, the fact that the Legislature has enacted environmental legislation in recognition of the Executive Order's goals does not bestow on the Executive Order any more power than it had before the Legislature acted.

Moreover, although the Legislature has exercised its own independent prerogative by tasking CARB with adopting regional GHG reduction targets for 2020 and 2035, it has not done so for 2050. As I also discuss, the Legislature is currently considering a comprehensive and complex plan for 2050 that tasks the CARB to establish regional targets. It is possible the Legislature may alter the Executive Order's 2050 goals or reject them altogether. Using the majority's own logic, the Legislature has not ratified the Executive Order's qualitative or quantitative goals for 2050.

It is true, of course, that *qualitative* thresholds of significance are acceptable in assessing significance. (See Guidelines, § 15064.7, subd. (a).) However, qualitatively addressing the policy and sciences underlying the Executive Order—if this in fact is what the majority means by a "consistency analysis"—adds little if any meaning to the discussion of the significance of GHG impacts. SANDAG considered in its EIR the

5

important public policy of GHG emissions reduction in implementing its project. It acknowledged the Executive Order and its goals. It concluded the 2050 goal in that order was not at this time applicable. The purpose of remand is therefore unclear to me if the majority merely requires additional, undefined consideration of the qualitative aspects of the Executive Order.

*Quantitatively* speaking, as noted, SANDAG in its EIR considered, but did not use, the 2050 GHG reduction targets set forth in the Executive Order. Until the Legislature independently acts and tasks the CARB with adopting regional 2050 GHG emissions reduction targets, SANDAG in my view was not required to consider in its EIR the broad 2050 statewide goals set forth in the Executive Order. (See *Professional Engineers*, *supra*, 50 Cal.4th at p. 1047.)

The majority states that it is not requiring SANDAG's project to "*achieve* the Executive Order's 2050 goal or any other specific numerical goal" in undertaking the now-required "consistency analysis." (Maj. opn. *ante*, at p. 15, fn. 6.) This comes as little surprise, inasmuch as an EIR is merely an "informational document." (See Guidelines, § 15003, subd. (i).)

Nonetheless, whether qualitative or quantitative, it is not clear to me how, in assessing the significance of GHG impacts of the project—including for 2050—a lead agency is supposed to adopt from the Executive Order *regional* GHG emissions reduction targets. The majority appears to answer this question by stating SANDAG can determine its "share" of GHG emissions reduction responsibility from theoretical targets. With respect to SANDAG's share of responsibility, it is important to emphasize what the majority has not acknowledged: SANDAG is responsible only for its "*fair* share" when

6

assessing significance.  Establishing an agency's "*fair* share" is a complex and science-based process.  It begins by recognizing that the level of GHG emissions is a statewide problem encompassing a diverse array of emitters.  Included in the array is not only transportation but also, for example, land use and development, agriculture, electricity generation, forestry, and industrial sectors.  The analysis of GHG impacts thus involves emissions across sectors both within SANDAG's planning discretion (i.e., transportation and land use) and outside SANDAG's planning discretion (i.e., heavy industry).  SANDAG is not empowered or equipped to offer and use analyses in statewide sectors over which it has no control.

The point is SANDAG, unlike the CARB, is a *regional* and not a state agency.  Without a model addressing *regional* GHG emissions reduction targets between 2035 and 2050, it is impossible for SANDAG in its RTP to conduct a "consistency analysis" for these years of study.

As the lack of substance in the now-required "consistency analysis" attests, there is little to say except that, in the world of GHG emissions, "more of them are bad and less is good."  It is a reasonable conclusion here that the SANDAG Board of Directors, comprised of locally elected officials from San Diego County and the 18 cities in the region, are already well aware of this.  The EIR in any event recognizes the important policy goal of reducing GHG emissions.

As I discuss, there is legislation currently pending tasking the CARB with setting state and regional targets for 2050.  This pending legislation further demonstrates my point that the Legislature has not yet independently adopted the Executive Order's 2050 statewide GHG emissions reduction goals.  Once the CARB sets these regional targets,

7

which incidentally, may be different than the Executive Order's statewide goal, SANDAG and the other 18 metropolitan planning agencies (MPO's) throughout the state can then use them to determine their "*fair* share" of GHG emissions in analyzing the significance of GHG impacts of their projects. I fear the majority's demand that SANDAG "do more" *now* based on mere policy goals and/or theoretical targets, and without providing any guidance as to what more should be done, will in effect require SANDAG to set unilaterally 2050 regional GHG reduction targets in order to try to satisfy, somehow, the majority's "consistency analysis." In doing so, it may take action that ultimately conflicts with requirements set by CARB.

Perhaps the most profound harm arising from the majority's finesse of CEQA is the lasting damage it does to Guidelines section 15064.4. This section gives a lead agency substantial discretion to determine both the amount of GHG emissions from a project and whether such emissions are significant. Subdivision (b) of Guidelines section 15064.4 in particular states that in assessing GHG impacts, the lead agency *should* consider three factors, *among others*. One such factor expressly gives a *lead agency* the discretion to determine the thresholds of significance that should apply to its project in determining significance. (Guidelines, § 15064.4, subd. (b)(2).) To the extent thresholds of significance *other* than the three expressly provided in subdivision (b) apply, that should be a determination made by an agency in the proper exercise of its discretion.

It is apparent to me that identifying and selecting thresholds of significance is not a judicial function. Despite the clear language of Guidelines section 15064.4, subdivision (b) and the obvious intent of that section, the majority asserts a right to determine that a gubernatorial policy statement, which does not qualify as a threshold of significance, is to

8

be included among the "other factors" and then *orders* SANDAG on remand to develop an undefined "consistency analysis" between the lead agency's plan and the policy statement.

This insinuation of judicial power into the environmental planning process and usurping of legislative prerogative is breathtaking. Now we, the courts, without institutional planning expertise or knowledge, get to tell a lead agency what it must use as a threshold of significance. As a consequence of not being prescient enough to know what a court might select, the EIR's of projects such as this RTP, which, as noted, calls for investment of about $214 billion in the San Diego region over the next few decades, are invalidated and sent back to the lead agency to anticipate what we, the court, might next decide is or has become of such critical policy significance that the agency must use it as a threshold of significance. There is no legal support for our action, which strips lead agencies of the discretion vested in them by the Legislature and reposes that discretion in the courts. To be clear, I do not believe our action expands Guidelines section 15064.4; instead, I believe it destroys the integrity of that section. (See Maj. opn. *ante*, at p. 20, fn. 9.)

The mischief caused by the majority would not be confined to the SANDAG region. The majority would have each of our states' six appellate districts, and multiple divisions within many of them, instructing the 18 MPO's regarding whether a "consistency analysis" is required based on, for example, the Executive Order, and, if so, what it should contain. It does not take much energy to foresee the permutations possible as each MPO receives judicial instruction. Chaos in environmental planning comes to mind.

9

The Legislature, in its wisdom, has foreseen the kind of damage we do today, and it has taken steps to forbid such judicial interference. First, the Legislature vested one agency, CARB, with creating the targets and metrics in assessing, and ultimately reducing, GHG emissions regionally and statewide. (Health & Saf. Code, § 39003.) Second, it has, in CEQA itself, expressly prevented courts from selecting what "other factors" an agency should consider in assessing significance of GHG impacts.

Indeed, section 21083.1 provides the legislative intent underlying CEQA and the interpretation of its statutes and guidelines by our courts: "It is the intent of the Legislature that courts, consistent with generally accepted rules of statutory interpretation, shall not interpret this division or the state guidelines adopted pursuant to Section 21083 in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines." Judicial imposition of significance thresholds does precisely what the statute prohibits.

As I discuss in more detail *post*, I conclude substantial evidence in the record shows SANDAG made a good faith and reasonable effort to analyze in its EIR the GHG impacts of its project. In its 39-page GHG impacts analysis, SANDAG, as noted, analyzed the targets set by the CARB for 2020 and 2035 under three thresholds of significance, in compliance with Guidelines section 15064.4. I thus would *reverse* the trial court's order finding SANDAG's GHG impacts analysis of the project was inadequate, including because SANDAG did not address the 2050 GHG *statewide* reduction goals set forth in the Executive Order.

As to the cross-appeal, because the trial court declined to reach those issues and because the majority in any event is remanding the matter with respect to the EIR's

10

treatment of GHG impacts and mitigation measures of the project, I would defer the issues raised in the cross-appeal to the trial court for consideration in the first instance.  I do, however, note that our instructions on remand include what appears to be a directive that SANDAG consider further analysis of mass transportation.  This directive, coupled with the vague requirement of a "consistency analysis," leaves me with an uncomfortable feeling that some might believe that, in sending this case back, we are *sub rosa* directing SANDAG to shift the emphasis in its plan to mass transportation.  If that is a direction in which we inadvertently venture, I would only comment that it is not a journey we are empowered or equipped to undertake.

DISCUSSION

I

GHG Impacts

A. *Regulation of GHG by the CARB*

On June 1, 2005, at the United Nations World Environment Day in San Francisco, Governor Schwarzenegger signed the Executive Order in front of hundreds of international leaders.  The Governor told his invited guests, which included mayors from more than 70 cities from around the world, that the "debate" over global warming from GHG emissions was "over."  (Marshall, *Schwarzenegger Issues Plan to Reduce Greenhouse Gases* (June 2, 2005) N.Y. Times <http://www.nytimes.com/2005/06/02/national/02arnold.html?_r=0> [as of November 2014].)

The Executive Order established the following *statewide* reduction targets for greenhouse gas emissions: by 2010, to 2000 levels; by 2020, to 1990 levels; and by 2050, to 80 percent below 1990 levels.  It also directed the California Environmental Protection

11

Agency (Cal-EPA) to develop strategies to meet these targets. In response, the "Climate Action Team," comprised of representatives from various agencies and commissions including the Cal-EPA and the CARB, was created. (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 938; see also Comment, *Quantifying an Uncertain Future: The Demands of the California Environmental Quality Act and the Challenge of Climate Change Analysis* (2012) McGeorge L.Rev. 1065, 1068-1069.)

Although the Executive Order provided the "power" for its issuance was derived from "the Constitution and statutes of the State of California," that order did *not* identify any article, section and/or statute as the source of this alleged authority. In any event, as noted, I do not believe our Constitution, including article V, vested the Governor with the authority to singlehandedly issue and enforce the Executive Order. (See, i.e., *Professional Engineers*, *supra*, 50 Cal.4th at p. 1015 [rejecting the argument the governor had the unilateral authority to implement a mandatory furlough program].) I also do not believe that our Legislature expressly granted that authority to the Governor. (See *id.* at p. 1000.) Therefore, I believe the GHG statewide emission reduction targets set forth in the Executive Order are nothing more than mere policy recommendations unless and until our Legislature independently acts to adopt such targets, which, as I explain, it has done for 2020 and 2035, but not for 2050. (See *ibid.*)

The Executive Order was by no means the first attempt in our state to address GHG emissions. In 2002, our Legislature passed a law regulating GHG vehicle emissions. (See Stats. 2002, ch. 200, enacting Assem. Bill No. 1493 (2001-2002 Reg. Sess.) (AB 1493).) Under this law, the CARB was required to develop and adopt, by

12

January 1, 2005, "regulations that achieve the maximum feasible and cost-effective reduction of greenhouse gas emissions from motor vehicles." (Health & Saf. Code, § 43018.5, subd. (a).) In enacting this law, our Legislature noted that the "control and reduction of emissions of greenhouse gases are critical to slow the effects of global warming." (Stats. 2002, ch. 200, § 1(c).) Thus, AB 1493 shows that our state policy of reducing GHG emissions did *not* originate with the 2005 Executive Order, as the majority appears to suggest, but rather was in existence before the Executive Order was issued.[3]

The California Global Warming Solutions Act of 2006 (Health & Saf. Code, § 38500 et seq., added by Stats. 2006, ch. 488, § 1, enacting Assem. Bill No. 32 (AB 32)) implemented the 2020 reduction target set forth in the Executive Order. (See Health & Saf. Code, § 38550; see also *Rialto Citizens for Responsible Growth v. City of Rialto*, *supra*, 208 Cal.App.4th at p. 939.) AB 32 directed the CARB to develop a "scoping plan . . . for achieving the maximum technologically feasible and cost-effective reductions in greenhouse gas emissions from sources or categories of sources of greenhouse gases . . . ." (Health & Saf. Code, § 38561, subd. (a); see Health & Saf. Code, § 38562, subd. (a) [requiring the CARB to "adopt greenhouse gas emission limits and emission reduction measures by regulation . . . to become operative beginning on January 1, 2012"]; see also *Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487, 1490 [noting AB 32 designated the CARB as "'the state agency

---

3     Our Legislature as early as 1975 tasked the CARB with the responsibility of "coordinating efforts to attain and maintain ambient air quality standards, to conduct research into the causes of and solution to air pollution, and to systematically attack the serious problem caused by motor vehicles, which is the major source of air pollution in many areas of the state." (Health & Saf. Code, § 39003.)

13

charged with monitoring and regulating sources of emissions of greenhouse gases that cause global warming in order to reduce emissions of greenhouse gases' . . . and imposes numerous directives and timelines on the [CARB]"].)

To assist an agency in its analysis of GHG emissions in CEQA review, our Legislature in 2007 enacted, among other provisions, section 21083.05 (added by Stats. 2007, ch. 185, § 1, enacting Sen. Bill No. 97 (SB 97)).[4] SB 97 directed the Office of Planning and Research (OPR) to prepare and submit to the Natural Resources Agency (NRA) "guidelines for the mitigation of greenhouse gas emissions or the effects of greenhouse gas emissions . . . including, but not limited to, effects associated with transportation or energy consumption." (Former § 21083.05, subd. (a).) SB 97 further provided that the OPR and NRA "shall periodically update the guidelines to incorporate new information or criteria" established by the CARB pursuant to AB 32. (*Id.*, subd. (c).)

The NRA adopted regulations on the significance of GHG emissions for CEQA, which were then incorporated into the CEQA Guidelines including, as perhaps most relevant here, Guidelines section 15064.4, discussed *post*.[5]

In 2008, our Legislature passed the Sustainable Communities and Climate Protection Act of 2008 (Sen. Bill No. 375 (2007-2008 Reg. Sess.)). As the majority recognizes, SB 375 supports the state's climate action goals to reduce GHG emissions through coordinated transportation and land use planning. Under SB 375, the CARB—

---

[4]    SB 97 was amended effective January 1, 2013. (Stats. 2012, ch. 548, § 5.)

[5]    "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

14

once again—was directed to provide each region by no later than September 30, 2010 with GHG emission "reduction targets for the automobile and light truck sector for 2020 and 2035, respectively." (Gov. Code, § 65080, subd. (b)(2)(A).) Once these targets were established by the CARB, each of the state's MPO's was required to prepare under Government Code former section 65080, subdivision (b)(2) a "sustainable communities strategy" (SCS) as part of the MPO's RTP. (See Gov. Code, former § 65080, subd. (b)(2).)[6]

In developing the SCS, SB 375 required each MPO to "conduct at least two informational meetings . . . within the region for members of the board of supervisors and city councils" on the SCS. (Gov. Code, § 65080, subd. (b)(2)(E).) The purpose of the meetings was to "discuss the [SCS] . . . , including the key land use and planning assumptions to the members of the board of supervisors and the city council members in that county and to solicit and consider their input and recommendations." The SCS, if and when implemented, would allow the MPO to reach the GHG reduction targets established by the CARB. If those targets were unmet, the MPO would be required to prepare an alternative planning strategy to the SCS. (Gov. Code, § 65080, subd. (b)(2)(E).)

As *the* agency responsible for "target-setting" GHG emissions reductions, the CARB in 2010 created reduction targets for SANDAG's MPO region for 2020 and 2035.

---

6    Government Code section 65080 was amended effective January 1, 2010 (Stats. 2009, ch. 354, § 1) and again effective January 1, 2011 (Stats. 2010, ch. 328, § 95). The requirement of an SCS as part of an MPO's RTP remains in the current version of Government Code section 65080, subdivision (b).

15

SANDAG used these targets in addressing in its EIR the GHG impacts of the project. However, as SANDAG properly recognized in its EIR impact analysis, the CARB has not yet set 2050 GHG emissions reduction targets for the MPO's. As noted and as I discuss, there is legislation currently pending, Assembly Bill No. 2050 (AB 2050), that would require the CARB to do so.[7]

Thus, our Legislature has recognized the strong public policy of GHG emissions reductions in our state and has fully occupied this enormously complex field by delegating the "target-setting responsibility" of such reductions to the CARB through a series of comprehensive legislative enactments, including in AB 32, SB 97 and SB 375.[8]

---

[7] According to a recent summary prepared by the Senate Appropriations Committee, AB 2050 would amend SB 32 by requiring "the California Air Resources Board (CARB) to develop greenhouse gas (GHG) emissions reductions goals for 2050, including intermediate goals, and to perform a number of analyses of the strategies that would be required to reach those goals" for purposes of the next scoping plan update. (Sen. Appropriations. Com., analysis of Assem. Bill No. 2050 (2013-2014 Reg. Sess.) p. 1.)

[8] This list is not exhaustive. For example, in 2010 legislation was enacted requiring the Department of Transportation to update the federally mandated California Transportation Plan (CTP) by December 31, 2015 and every five years thereafter. (Gov. Code, §§ 65070, subd. (a) & 65071.) The CTP requires identification of a "statewide integrated multimodal transportation system" that includes among other requirements the incorporation of all SCS and/or alternate planning strategies required by SB 375. (Gov. Code, § 65072.2) "In developing the [CTP] . . . , the department shall address how the state will achieve maximum feasible emissions reductions in order to attain a statewide reduction of [GHG] emissions to 1990 levels by 2020 as required by [AB 32] and 80 percent below 1990 levels by 2050." (*Ibid.*) The CTP must include: "(a) A policy element that describes the state's transportation policies and system performance objectives. These policies and objectives shall be consistent with legislative intent described in Sections 14000, 14000.5, 14000.6, and 65088. [¶] (b) A strategies element that shall incorporate the broad system concepts and strategies synthesized from the adopted regional transportation plans prepared pursuant to Section 65080. The California Transportation Plan shall not be project specific. [¶] (c) A recommendation element that includes economic forecasts and recommendations to the Legislature and the Governor to

The CARB in response has then set reduction targets for each of the 18 MPO's in our state.

Against this backdrop, I disagree with the majority's conclusion that SANDAG acted unreasonably in refusing to engage in a "consistency analysis" using the Executive Order as a CEQA measuring stick when accessing the GHG impacts of its regional project. (See *Professional Engineers*, *supra*, 50 Cal.4th at p. 1000.) Instead, in my view, the record contains more than sufficient evidence showing SANDAG acted in good faith and properly exercised its broad discretion under Guidelines section 15064.4 in assessing the significance of GHG impacts of the project.

---

achieve the plan's broad system concepts, strategies, and performance objectives." (*Id.*, § 65072.) The Legislature in the CTP directly (*id.*, § 14000.6, subd. (b)) and indirectly (*id.*, § 65072.2) referenced the Executive Order and its goal of reducing GHG emissions to 80 percent of 1990 levels by 2050. However, as noted, the Legislature has not yet tasked the CARB to set 2050 GHG regional reduction targets for the MPO's.

B. *Guidelines Section 15064.4*[9]

As noted, CEQA requires that public agencies "adopt by ordinance, resolution, rule, or regulation" criteria for the evaluation of a project and the preparation of an EIR that are consistent with the statutory provisions of CEQA and its Guidelines. (§ 21082.)

Section 21083, subdivision (a) directs the OPR to "prepare and develop proposed guidelines" for implementation by a public agency. Subdivision (b) of that statute states the "guidelines shall specifically include criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment.'" As noted *ante*, section 21083.5 was added by SB 97 to require the OPR to

---

[9]     Guideline section 15064.4 provides: "(a) The determination of the significance of greenhouse gas emissions calls for a careful judgment by the lead agency consistent with the provisions in section 15064. A lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project. A lead agency shall have discretion to determine, in the context of a particular project, whether to: [¶] (1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use. The lead agency has discretion to select the model or methodology it considers most appropriate provided it supports its decision with substantial evidence. The lead agency should explain the limitations of the particular model or methodology selected for use; and/or [¶] (2) Rely on a qualitative analysis or performance based standards. [¶] (b) A lead agency should consider the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment: [¶] (1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project. [¶] (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions. If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding compliance with the adopted regulations or requirements, an EIR must be prepared for the project."

18

prepare specific guidelines dealing with CEQA review of GHG.

Adopted after passage of SB 97, Guidelines section 15064.4, subdivision (a) requires a lead agency to make a "good-faith effort" to determine the GHG emissions of a project. In making this determination, a lead agency has the discretion to "[u]se a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use" (Guidelines, § 15064.4, subd. (a)(1)) and/or to "[r]ely on a qualitative analysis or performance based standards" (*id.*, subd. (a)(2)). After choosing a methodology and selecting significance thresholds, the lead agency next is required under Guidelines section 15064.4 to assess the "significance of impacts" of GHG emissions. (*Id.*, subd. (b).)

In assessing the significance of GHG impacts of a given project, Guidelines section 15064.4 states a lead agency "should" consider among others the following factors: (1) the extent to which the project may increase or reduce GHG "as compared to the existing environmental setting"; (2) whether the project's GHG emissions "exceed a threshold of significance that the *lead agency determines* applies to the project"; and (3) the extent to which the project "complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation" of GHG. (Guidelines, § 15064.4, subd. (b)(1), (2) & (3), italics added.) Subdivision (b)(3) of Guidelines section 15064.4 further provides that "[s]uch requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions."

Guidelines section 15064.4 thus "'confirms that lead agencies retain the discretion to determine the significance of greenhouse gas emissions and should "make a good-faith

19

effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of [GHG] emissions resulting from a project." [Citation.]' [Citations.]" (*Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 807.)

I therefore disagree with the majority's interpretation of Guidelines section 15064.4: although subdivision (b) of this section clearly states the factors listed in subdivisions (1), (2) and (3) are not exhaustive, that does not ipso facto mean the courts may require an agency to consider additional "factors" (i.e., the Executive Order) in evaluating the GHG impacts of a project, as the majority has done here. In my view, the majority's reading of Guidelines section 15064.4 usurps the broad discretion afforded an agency in analyzing significance and improperly puts courts in charge of determining whether benchmarks other than those expressly provided in subdivisions (1), (2) and (3) must be considered by an agency when undertaking such an analysis.

Here, as I have noted, the EIR used three separate GHG analyses utilizing two of the specific significance criteria authorized by Guidelines section 15064.4. GHG-1, the first analysis, is an "existing conditions" baseline analysis authorized by subdivision (b)(1) of Guidelines section 15064.4.[10] Under this analysis, any increase of GHG emissions over existing conditions (i.e., 2010) was deemed to be a significant impact.

---

[10] I note the existing environmental setting "normally constitute[s] the baseline physical conditions by which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd. (a); see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 445 [holding that "[w]hile an agency has the discretion under some circumstances to omit environmental analysis of impacts on existing conditions and instead use only a baseline of projected future conditions, existing conditions 'will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant'"].)

20

The GHG-1 analysis concluded that, although regional GHG emissions would decrease under the project from existing levels until after 2020, they would increase above existing levels by 2035 and increase still further by 2050, largely as a result of population increase and development. The EIR therefore determined the GHG impacts in 2020 would be a less than significant impact but would be significant in 2035 and 2050.

The second analysis, GHG-2, used the GHG reduction targets set forth in SB 375 as a significance criteria. GHG-2 used a narrower range of GHG emissions than GHG-1. GHG-2's approach, in my view, was also fully consistent with Guidelines section 15064.4.

Under SB 375, as I have noted, the CARB prepared regional GHG emission reduction targets, compared to 2005 emissions, for cars and light trucks for 2020 and 2035 for each of the state's MPO's. In response, each of the MPO's, including SANDAG, prepared an SCS as part of its RTP to "reduce GHGs by better aligning transportation, land use, and housing. For SANDAG, the targets are to reduce per capita $CO_2$ emissions 7 percent below 2005 levels by 2020 and 13 percent below 2005 levels by 2035. Because CARB has not developed a target for 2050, no analysis is provided for that year."

Using this significance criteria, the EIR concluded the project would have less than a significant impact because the project met SB 375's goals, as set by the CARB, for lowered per capital vehicle-related GHG emissions in 2020 and 2035.

The third GHG impact analysis, GHG-3, analyzed whether regional GHG emissions (from both transportation and land use/growth) would conflict with (1) the scoping plan adopted by the CARB pursuant to AB 32, which plan functions as a roadmap to achieve GHG reductions in our state, and (2) SANDAG's own adopted

21

Climate Action Strategy (CAS), which was created in 2010 under a partnership with the California Energy Commission "as a guide for SANDAG and local governments and policymakers in addressing climate change."

Because the scoping plan time horizon was limited to 2020, the EIR's analysis of whether or not the project under GHG-3 would have a significant impact with respect to GHG was limited to 2020, and no analysis was presented for 2035 and 2050. Although recognizing 2035 and 2050 emission reduction targets for GHG's were established in the Executive Order, the EIR in my view properly concluded the order was not a "'plan'" adopted through a public review process as required in subdivision (b)(3) of Guidelines section 15064.4. The EIR, however, analyzed transportation and land use/growth in 2035 and 2050 expected as a result of implementation of the project, with respect to the CAS.

The EIR analysis concluded that with respect to transportation, the estimated emissions from transportation in 2020 would be less than required by AB 32 and would constitute a less than significant impact under this threshold. The EIR also concluded that the project would not impede the CAS and its policy of promoting the reduction of vehicle miles traveled and minimization of GHG in transportation, inasmuch as the project also sought to reduce GHG emissions in transportation through a series of projects. Therefore, for transportation, the EIR found the implementation of the project would constitute a less than significant impact under the CAS threshold for 2020, 2035 and 2050.

With respect to land use/growth, the EIR analysis concluded in GHG-3 that emissions of GHG in 2020 were expected to exceed the scoping plan reduction goals. However, it noted several other measures included in the scoping plan were not yet

22

adopted or implemented, including "cap-and-trade," and, therefore, were not included in the GHG reduction calculations. Because the RTP was itself consistent with its role in the overall scoping plan strategy, SANDAG concluded for land use/growth that for 2020 the impact would be less than significant under this threshold. The EIR further provided for 2020, 2035 and 2050, implementation of the project would not impede the CAS but in fact would promote it and the goals of increasing energy efficiency and reducing energy consumption and, therefore, would constitute a less than significant impact.

C. *Substantial Evidence Supports the Finding SANDAG's Assessment of Significance of GHG Impacts in its EIR Satisfied CEQA*

Unlike my colleagues, I do not believe SANDAG's failure to discuss the project's consistency with the Executive Order shows a lack of a "good-faith effort" to assess in the EIR the GHG impacts of the project.[11] Rather, in my view, there is abundant evidence in the record showing that SANDAG made a "good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions [in the SANDAG MPO region] resulting from [the] project" (Guidelines, § 15064.4, subd. (a)); and that it properly assessed the significance of these emissions under applicable thresholds (*id.*, subd. (b)), including those adopted by the CARB (through enabling legislation) for 2020 and 2035. (See *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 335-336 (*City of Chula Vista*).)

---

11    In finding an alleged lack of evidence in the record of a reasonable, good-faith effort by SANDAG to assess the GHG impacts, the majority, in my view, is in effect applying an independent standard of review, and its contention otherwise is one of form over substance. (Maj. opn. *ante*, at p. 14.)

Moreover, the record also contains substantial evidence showing SANDAG properly exercised its discretion when it decided not to use the Executive Order's 2050 statewide emission reduction target as a CEQA measuring stick for its regional plan. *North Coast Rivers Alliance v. Marin Municipal Water Dist. Board of Directors* (2013) 216 Cal.App.4th 614 (*North Coast*) informs my view on this issue.

There, the petitioners contended an EIR for a project to build a sea-water desalination plant approved by a local water district was deficient because, among other reasons, it contained an inadequate analysis of GHG emissions. Although the trial court rejected this argument, it nonetheless found the EIR lacked substantial evidence to support the water district's conclusion the plant's GHG emissions were not cumulatively considerable. (*North Coast*, *supra*, 216 Cal.App.4th at p. 650.)

In reversing, the court concluded the EIR's use of AB 32, and its requirement that the CARB "'adopt regulations that would require the reporting and verification of statewide GHG emissions and limit statewide GHG emissions to 1990 levels by 2020,'" was acceptable as a threshold of significance, inasmuch as the EIR properly noted "no CEQA thresholds of significance have been established for GHG[]." (*North Coast*, *supra*, 216 Cal.App.4th at p. 651.) The court also concluded the EIR used as a threshold a program voluntarily adopted by Marin County, which the water district joined, where GHG emissions would be reduced to 15 percent below 1990 levels by 2020. (*Ibid.*)

The *North Coast* court then reviewed the EIR in light of these thresholds, which focused primarily on energy consumption for plant operations. (*North Coast*, *supra*, 216 Cal.App.4th at p. 652.) In concluding the EIR's analysis "more than satisfied the requirements of CEQA" (*id.* at p. 652), the court recognized that the petitioners'

24

disagreement with the district's significance conclusion for GHG impacts was insufficient under CEQA because a """reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, [the court's] 'task is not to weigh conflicting evidence and determine who has the better argument.'"""  (*Id.* at p. 653.)

Similarly, this court in *City of Chula Vista* rejected the petitioner's contention the lead agency (i.e., the city) was required to use three other well-recognized potential thresholds of significance, instead of the goals set forth in AB 32, in analyzing the GHG impacts of a store replacement project.  Citing to then-newly enacted Guidelines section 15064.4, this court concluded that this regulation "confirms that lead agencies retain the discretion to determine the significance of greenhouse gas emissions."  (*City of Chula Vista*, *supra*, 197 Cal.App.4th at p. 336.)  This court also concluded the lead agency "properly exercised its discretion to utilize compliance with [AB 32] as the threshold" and, as such, *rejected* the petitioner' contention the lead agency erred by not applying different thresholds.  (*Ibid.*; see *Citizens Against Airport Pollution v. City of San Jose*, *supra*, 227 Cal.App.4th at p. 807 [recognizing that Guidelines, § 15064.4 gives a lead agency discretion to determine the significance of GHG emissions based to the extent possible on available scientific and factual data].)

*North Coast* and *City of Chula Vista*, in my view, provide guidance in the instant case and support the conclusion that SANDAG properly exercised its discretion under Guidelines section 15064.4, subdivision (b)(1), (2) and (3), including when it used the regional target numbers established by the CARB (developed in response to AB 32 and SB 375) in analyzing the impacts of GHG of the project.  (See *Citizens for a Sustainable*

25

*Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1060-1061 [noting the "core principle" that an EIR is not required to engage in "speculative analysis," and, thus, a lead agency is not required to "'forsee[] the unforeseeable,'" "predict[] the unpredictable or quantify[] the unquantifiable"] (*Treasure Island*).) *North Coast* and *City of Chula Vista* also support the conclusion that, subject to the requirements of Guidelines section 15064.4, lead agencies and not the courts have the discretion to determine the benchmarks to be used for determining the GHG impacts of a project.

Indeed, as I previously noted, there is legislation currently pending, Assembly Bill No. 2050 (AB 2050), that among other purposes would delegate to the CARB the authority to set specific GHG emission reduction targets for the MPO's, including in the SANDAG region, but in this instance, the targets would be for 2050. Regardless of whether AB 2050 ultimately passes, the bill is significant because it shows our Legislature has not yet acted to set 2050 reduction targets (through the CARB). AB 2050 also demonstrates, yet again, the intent of the Legislature to fully occupy the field of regulating GHG emissions in our state. I believe the majority ignores this intent by requiring SANDAG, based on a strained interpretation of Guidelines section 15064.4, to do a "consistency analysis" using the Executive Order as a CEQA measuring stick. I also believe doing so has far-reaching, negative consequences.

By imposing a requirement on SANDAG that does not exist under CEQA, including in the applicable GHG Guidelines, the majority is contravening section 21083.1, as I have already discussed. In addition, as I have noted, the regulation of GHG emissions is better left to our Legislature and government agencies like the CARB in

26

what is clearly an area that "involves numerous highly technical and novel scientific, technical and economic issues" that will span many decades. (*Association of Irritated Residents v. State Air Resources Bd.*, *supra*, 206 Cal.App.4th at pp. 1502, 1505 [noting the CARB has been "assigned the responsibility of designating and overseeing the implementation of measures" to achieve the "challenging" goals of reducing GHG emissions in our state].)

The complexity of the issues addressed by SANDAG's RTP, the first of its kind to be approved in this state, cannot be overstated. The sheer volume of the record in this case pays homage to the difficult issues facing a lead agency like SANDAG in preparing a RTP with an SCS component, where transportation planning and land use are linked to regional GHG emissions reduction goals for the next several decades. In contrast, judges "have neither the resources nor scientific expertise to engage in such analysis." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393.)

Until our Legislature directs the CARB to set regional goals for 2050, I do not believe SANDAG was required to use the Executive Order and/or its 2050 GHG statewide reduction goal as a threshold to assess the significance of the GHG impacts of the project. (See *Treasure Island*, *supra*, 227 Cal.App.4th at p. 1054 [refusing to "fault" an EIR for a project to redevelop a former naval station into a new, mixed-use community because there were many project features that were subject to future revision, and, thus, the EIR "cannot be faulted for not providing detail that, due to the nature of the [p]roject, simply does not now exist"].)

27

Finally, the majority in my view is unnecessarily interfering with SANDAG's program EIR and tiering, which frustrates the goal of good planning: "Where a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof . . . , the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of a more limited geographic scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand." (Guidelines, § 15152, subd. (c).)

Our high court in *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143 rejected a challenge to a program EIR on the basis it lacked sufficient detail regarding water sources to implement a project to restore the ecological health and improve the management of the Bay-Delta region. In so doing, the court noted that the Bay-Delta project was a "broad, general, multiobjective, policy-setting, geographically dispersed" plan (*id.* at p 1171); that at the first-tier program level, the "environmental effects of obtaining water from potential sources may be analyzed in general terms, without the level of detail appropriate for second-tier, site-specific review" (*id.* at p. 1169); that the advantage of a program EIR is it allows a lead agency "'to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts'" (*ibid.*, citing Guidelines, § 15168, subd. (b)(4)); and that because the Bay-Delta project "is to be implemented over a 30-year period[,] . . . [i]t is therefore impracticable to foresee with certainty specific sources of water and their impacts" (*id.* at p. 1172).

Much like the Bay-Delta project, the project here is a "broad, general, multiobjective, policy-setting" plan. (See *In re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1171.) As such, I believe substantial evidence in the record shows SANDAG in its EIR engaged in a "good-faith effort" to analyze the GHG impacts of the project for purposes of the first-tier stage of what is clearly a long-term planning process that will be implemented over decades, "with the understanding that additional detail will be forthcoming when specific second-tier projects are under consideration." (See *id.* at p. 1172; see also *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 372 [upholding program EIR against a challenge it was vague and insufficiently described potential future facilities of a county's hazardous waste management plan because the plan, much like SANDAG's project at issue here, served only as an "assessment and overview, with any separate future projects, when identified, to be accompanied by additional EIR's"].)

According to SANDAG, implementation of the project will involve "literally hundreds of individual freeway, highway, local road, public transit, bikeway and other transportation projects, as well as ongoing development of various mitigation, planning and transportation management programs." In addition, many of these projects will occur 10, 20 or 30 years into the future and will be carried out by others including local governments and/or agencies, where baseline conditions may have substantially changed and after the project itself will have gone through multiple mandatory updates on a four-year cycle as currently required under Government Code section 65080, subdivision (d).

Because most, if not all, of these individual future transportation projects and/or land use decisions will be subject to its own project-level review under CEQA, and

29

because, in any event, SANDAG's EIR considered the public policy of GHG emission reduction and the CARB has not yet established 2050 GHG reduction target numbers for the SANDAG MPO region, I believe there is absolutely no reason to send the EIR back to the trial court for further consideration of GHG impacts utilizing the Executive Order as a threshold. Rather, I believe this is a waste of precious resources and will amount to "endless rounds of revision and recirculation of EIR's" that the Legislature did not intend. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132; see also Guidelines, § 15151 [stating that the "sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible" and that "courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure" in analyzing the adequacy of an EIR]; *Treasure Island*, *supra*, 227 Cal.App.4th at p. 1061 [noting it "has long been recognized that premature attempts to evaluate effects that are uncertain to occur or whose severity cannot reliably be measured is 'a needlessly wasteful drain of the public fisc'"].)

In sum, I conclude there is substantial evidence in the record showing SANDAG acted reasonably and in good faith when it addressed the GHG impacts of its project and properly exercised its discretion under Guidelines section 15064.4. I thus would reverse the trial court order finding SANDAG's GHG impacts analysis insufficient under CEQA.

II

Mitigation Measures

Initially, because I conclude the EIR adequately addressed the GHG impacts of the project, unlike the majority I do not deem moot (or partially moot) (Maj. opn. *ante*, at p. 23) SANDAG's contention that the EIR also adequately addressed mitigation measures

30

for the project's significant GHG impacts. Also unlike the majority, I conclude the EIR adequately considered reasonable mitigation measures for GHG impacts.

A. *Additional Background*

As noted, the EIR under the "existing conditions" baseline, GHG-1, concluded that the GHG impacts in 2020 would be a less than significant impact but would be significant in 2035 and 2050. Based on this analysis, the EIR proposed three mitigation measures to reduce impacts related to GHG emissions to less than significant levels.

The first mitigation measure, GHG-A, provided: "SANDAG shall update future Regional Comprehensive Plans and Regional Transportation Plans/Sustainable Community Plans to incorporate polices and measures that lead to reduced GHG emissions. Such policies and measures may be derived from the General Plans, local jurisdictions' Climate Action Plans, and other adopted policies and plans of its member agencies that include GHG mitigation and adaptation measures or other sources."

The second, GHG-B, encouraged the "San Diego region cities and the County government" to "adopt and implement Climate Actions Plans" (CAP's) and other climate strategies by: a) quantifying GHG emissions, "both existing and projected over a specified time period, resulting from activities within their respective jurisdictions"; b) establishing a "level . . . below which the contribution to GHG emissions from activities covered by the plan would not be cumulatively considerable"; c) identifying and analyzing GHG emissions "resulting for specific actions . . . anticipated within their respective jurisdictions"; d) specifying measures, "including performance standards, that . . . if implemented on a project-by-project basis, would collectively achieve the specified emissions level"; e) establishing a mechanism to monitor the "progress toward achieving

31

that level" of specified emissions and requiring an amendment if such levels are not achieved; and f) adopting such plans "in a public process following environmental review."

GHG-B further provided that, when appropriate, CAP's should "incorporate planning and land use measures from the California Attorney General's latest list of example policies to address climate change at both the plan and project level." At the plan level, GHG-B identified various policies to be considered and, if appropriate, implemented, from the website of the California Attorney General providing examples to address climate change, including "[s]mart growth, jobs/housing balance, transit-oriented development, and infill development through land use designations, incentives and fees, zoning, and public-private partnerships"; "[c]reate transit, bicycle, and pedestrian connections through planning, funding, development requirements, incentives and regional cooperation, and create disincentives for auto use"; [and] "[e]nergy and water-efficient buildings and landscaping through ordinances, development fees . . . and other implementing tools."

GHG-B also identified project-specific mitigation measures available on the website that, if appropriate, should be implemented at the plan level in a CAP's planning and land use measures, including adopting a "comprehensive parking policy" that encourages use of alternate transportation and discourages use of private vehicles; building or funding a "major transit stop within or near development"; providing public transit incentives, such as free or low-cost monthly transit passes to the public; incorporating bicycle lanes and routes into new development; and requiring facilities and amenities for non-motorized transportation, such as secure bicycle parking.

SANDAG in connection with GHG-B stated it would assist local governments in preparing CAP's and other climate strategies plans through implementation of its own CAS, which, as noted, was created in 2010 "as a guide for SANDAG and local governments and policymakers in addressing climate change."  The CAS "provides a toolbox of land use, transportation, and related policy measures and investments that help implement the 2050 RTP/SCS [i.e., the project] through reducing GHG emissions. Policy measures also are identified for buildings and energy use, protecting transportation and energy infrastructure from climate impacts, and to help SANDAG and local jurisdictions reduce GHGs from their operations."

The third mitigation measure discussed in the EIR, GHG-C, provided SANDAG and local governments should require "Best Available Control Technology" (BACT) in constructing and operating projects.

SANDAG also considered additional mitigation measures that were found to be infeasible.  One such measure was requiring all vehicles in the San Diego region to be either zero-emission vehicles or to be powered by renewable energy.  SANDAG found this measure infeasible because of the "rate of turnover of vehicles on the roadway" and because of the limited number of such vehicles available.  Another measure found to be infeasible was requiring all future construction to be net-zero energy use.  Although renewable energy is available and is an option for a portion of a project's energy needs, SANDAG concluded it was infeasible for all projects to have net-zero emissions (i.e., hospitals).

Finally, SANDAG also found infeasible the requirement that all future construction activity include only "retrofitted equipment."  Because certain equipment

33

does not have "retrofit components," SANDAG concluded this mitigation measure was infeasible.

SANDAG in the EIR noted that implementation of mitigation measures GHG-A through GHG-C "would reduce GHG emissions through adoption of measures and policies that encourage GHG emissions reduction in regional plans, adoption of Climate Action Plans by member agencies, and using BACT during construction and operation of implemented projects." Because of the growth in population, housing, and employment, the EIR concluded implementation of the project "would result in an increase in GHG emissions" and, as such, even with the mitigation measures, GHG-1, the existing conditions baseline, "would remain a significant and unavoidable impact in 2035 and 2050."

B. *Governing Law and Analysis*

It is axiomatic that an EIR must describe feasible measures that could minimize significant adverse impacts. (Guidelines, § 15126.4, subd. (a)(1).) Feasible means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (*Id.*, § 15364.)

However, a lead agency may find that "particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (Pub. Resources Code, § 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each significant effect, based on substantial evidence in the administrative

34

record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; (2) those measures are within the jurisdiction of another public agency and have been adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in the EIR infeasible, and specific overriding economic, legal, social, technological, or other benefits outweigh the significant environmental effects.  (Pub. Resources Code, §§ 21081, 21081.5; Guidelines, § 15091, subds. (a), (b).)"  (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1198; see *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 336 [noting that "'CEQA requires the appropriate public agency "to find, based on substantial evidence, that the mitigation measures are 'required in, or incorporated into, the project'; or that the measures are the responsibility of another agency and have been, or can and should be, adopted by the other agency; or that mitigation is infeasible and overriding considerations outweigh the significant environmental effects"'"].)

Claims concerning the feasibility or effectiveness of mitigation measures are reviewed for substantial evidence, which is defined as "'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'"  (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 486.)  In reviewing an agency's decision for substantial evidence, courts "'must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.'"  (*California Native Plant*

*Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 985.)  This standard of review flows from the fact that an "agency has the discretion to resolve factual issues and to make policy decisions."  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 120.)

"""As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking.  Failure to do so is fatal.  A reviewing court will not independently review the record to make up for appellant's failure to carry his [or her] burden."""  (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1572.)

Here, I conclude petitioners have not met their burden of showing the mitigation measures for GHG emissions described by SANDAG in its program EIR were inadequate.  As noted, the EIR discussed three separate mitigation measures in connection with impact analysis GHG-1.  Each such measure complies with Guidelines section 15126.4, subdivision (c)(5), which was adopted in response to SB 97 and which provides the GHG mitigation measures proposed in connection with adoption of a long-range plan, such as the instant project, "may include the identification of specific measures that may be implemented on a project-by-project basis."[12]

---

[12]    Subdivision (c) of Guideline section 15126.4 provides in part:  "[L]ead agencies shall consider feasible means, supported by substantial evidence and subject to monitoring or reporting, of mitigating the significant effects of greenhouse gas emissions.  Measures to mitigate the significant effects of greenhouse gas emissions may include, among others: [¶] (1) Measures in an existing plan or mitigation program for the reduction of emissions that are required as part of the lead agency's decision; [¶] (2) Reductions in emissions resulting from a project through implementation of project features, project design, or other measures, such as those described in Appendix F; [¶] (3) Off-site measures, including offsets that are not otherwise required, to mitigate a project's emissions; [¶] (4) Measures that sequester greenhouse gases; [¶] (5) In the case of the

Moreover, the record shows SANDAG considered additional mitigation measures to reduce GHG emissions and found them infeasible. (See *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 245 [noting that CEQA does not require "an EIR to explain why certain mitigation measures are infeasible"]; see also *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 351 [noting CEQA does not require an EIR to analyze in detail mitigation measures deemed infeasible].)

At the conclusion of the CEQA review process, the record shows SANDAG adopted both the mitigation measures within its power to implement and a mitigation monitoring program (MMRP) for compliance. (See §§ 21081 & 21081.6.) The mitigation measures and MMRP confirm SANDAG's commitment to implementing GHG mitigation measures described in the EIR.

I do not agree with petitioners that the mitigation measures were insufficiently unenforceable because, particularly with respect to GHG-A and GHG-B, they depended on the cooperation of multiple other agencies. As noted, CEQA allows a lead agency to approve or carry out a project with potential adverse impacts if "[c]hanges or alterations have been . . . incorporated into[] the project" and "[t]hose changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency." (§ 21081, subd. (a)(1) & (2).)

_____

adoption of a plan, such as a general plan, long range development plan, or plans for the reduction of greenhouse gas emissions, mitigation may include the identification of specific measures that may be implemented on a project-by-project basis. Mitigation may also include the incorporation of specific measures or policies found in an adopted ordinance or regulation that reduces the cumulative effect of emissions."

Finally, because SANDAG in my view satisfied its initial burden to consider a range of reasonable mitigation measures in its EIR, I would conclude the burden then switched to petitioners to establish from the record what petitioners describe as other "effective" mitigation measures that allegedly were omitted from consideration in the EIR and to show, again from the record, that such "effective" measures 1) were not only legally feasible but also suitable for discussion in a program EIR involving a project incorporating a broad range of planning measures and policies over the next several decades, *and* 2) would avoid or substantially lessen the project's GHG impacts.  (See *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 14-17 [rejecting the petitioners' contention that unspecified, additional mitigation measures should have been considered in "meaningful detail" in an EIR and noting the general rule that "CEQA does not . . . require discussion of every mitigation measure the agency rejected as infeasible"].)  I would conclude petitioners have not met, and cannot meet, this burden in this case.  (See *id.* at p. 17 [noting that "[f]easibility under CEQA encompasses desirability to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors"].)[13]

BENKE, J.

---

[13]    Because the trial court never reached the issues raised in the cross-appeal and because the majority in any event is remanding the matter with respect to the EIR's treatment of GHG impacts and mitigation measures of the project, as I have noted, I would defer the issues raised in the cross-appeal to the trial court for consideration. Nonetheless, I feel compelled to state my objection to the majority's conclusion that SANDAG failed to consider a reasonable range of project alternatives.